## COMMONWEALTH *vs.* TRACY L. PRASHAW.

No. 01-P-866.

Worcester. September 12, 2002. - January 8, 2003.

Present: LENK, MASON, & BERRY, JJ.

*Evidence,* Photograph, Relevancy and materiality, Inflammatory evidence. *Practice, Criminal,* Appeal, Indictment placed on file. *Search and Seizure,* Threshold police inquiry, Protective frisk.

At a criminal trial, the judge erred in admitting in evidence sexually explicit photographs of the defendant, where the probative value of the photographs was minimal, and where the effect of the photographs was to depict the defendant as a lewd woman and to lead the jury to believe that a woman of her character would be likely to commit the crimes charged [22-26]; because this court could not say with confidence that the jury was not unfairly influenced by the erroneously admitted photographs in reaching its verdicts on all of the offenses charged, including those that were placed on file, this court reversed all of the defendant's convictions [27].

The judge at a criminal trial did not err in denying the defendant's motion to suppress evidence found on her person during a patfrisk, where the police officer who detained the defendant, handcuffed her, and frisked her had reasonable suspicion to do so. [27-28]

COMPLAINTS received and sworn to in the Westborough Division of the District Court Department on December 27, 1999; January 4, 2000; and March 2, 2000.

A pretrial motion to suppress evidence was heard by *Paul S. Waickowski,* J., and the cases were tried before him.

*Dana Alan Curhan (Joseph I. Machera & Lori A. Benavides* with him) for the defendant.

*Christopher P. Hodgens,* Assistant District Attorney, for the Commonwealth.

BERRY, J. In this appeal, the defendant challenges the admission in evidence of photographs depicting her naked in various sexually provocative positions. Balancing the minimal probative value of the pictures with respect to the nonsex-related offenses

being tried[1] against the marked prejudice, we conclude that this is one of those exceptional cases where the bounds of the usual grant of wide discretion to a trial judge concerning the admission of photographic evidence were exceeded. Accordingly, we reverse the judgments of conviction.

1. *Background facts.* On December 26, 1999, a fire broke out in the house in which the defendant and her husband resided. During a "cause-and-origin" survey of the house after the blaze, an investigator saw in plain view in an upstairs bedroom a twelve-gauge shotgun standing in a corner against the wall, and marijuana "roaches" in an ashtray. The shotgun was immediately confiscated. Based on these sightings, the police applied for a warrant to search the house.

The defendant's husband was present in the house both when the fire started and during the fire investigation. The defendant was not at home and had left the house a few days before Christmas following an altercation with her husband during which he beat her and hit her face (this abuse was of a continuing pattern over many years, including past incidents of domestic violence requiring hospital treatment). Following this incident of violence, the defendant sought shelter at her mother's house in New York State. On the day after Christmas, she

---

[1]The case involved charges for possession of drugs, drug paraphernalia, a knife, and fireworks; improper storage of a shotgun; attempting to commit a crime; and disturbing the peace.

Following a jury trial, the defendant was convicted of the following: possession of cocaine (one count); possession of marijuana (two counts); possession of drug paraphernalia (two counts); possession of marijuana with intent to distribute (one count); carrying a dangerous weapon, a knife (one count); and possession of fireworks (one count). The defendant was sentenced to one year of probation on the charges of possession with intent to distribute marijuana and possession of cocaine. The remaining six offenses, with the defendant's consent, were placed on file.

The jury acquitted on a charge of unlawful storage of a shotgun. The judge granted the defendant's motion for a required finding of not guilty on the charges of attempting to commit a crime and of disturbing the peace. Before trial, the judge had dismissed other charges relating to an alleged breaking and entering. On the facts of this case, the reasons for the multitudinous charges, brought in four separate criminal complaints and adding up to fifteen separate charges, at best, are perplexing and, at worst, reflect prosecutorial overcharging.

returned home, only to see the house smouldering from the fire and firefighters and police on the scene.

The defendant entered the house, spoke to an officer, gathered some belongings, and described the assault that had led to her fleeing from the house.[2] The defendant's face had not healed and still bore a bruise from that assault. One of the officers escorted the defendant to the police station, where she applied for, and was granted, a protective order under G. L. c. 209A. Thereafter, she returned to the house, even though she had been previously told by an officer that she could not enter because the police were seeking a search warrant. There were curious aspects surrounding the circumstances of the defendant's return and her explanation of the reasons why she came back to the house. The details do not matter, but of moment is that, when she returned, there was a man with her (whom the officers throughout the trial only described as a black man) and that she had a plan to reenter the house with this man, notwithstanding the police directive not to do so.

While waiting for the search warrant application to be processed, the police had cordoned off the house and stationed an officer as sentry in an unmarked cruiser in front of the house. It was during this time that the defendant and the unidentified man returned to the burned-out house. The man entered the house through the back. When the entry was discovered, another officer was dispatched to the scene to investigate the break-in. A witness, a neighbor, identified the defendant, who was standing nearby, as having "had something to do with this" break-in. The officer approached the defendant, handcuffed her, and conducted a patfrisk. A "crack" cocaine pipe containing cocaine residue was found in her pocket. The defendant was arrested. The man who had entered the house had been arrested by the officer stationed in front of the house.

Thereafter, two search warrants — one for the house and one for a Toyota Four-Runner sport utility vehicle — were executed. Seized from the Toyota were a knife with a seven-inch blade, a

---

[2]She also informed the officer of her husband's threat that he would get the house for himself no matter what. The defendant, who from time to time worked as a real estate broker, had provided the funds to buy the house and owned it in her own name.

small quantity of marijuana, and rolling papers. Seized from the upstairs bedroom were marijuana roaches, a small amount of marijuana in a plastic bag, two bottles that had been crafted into crack cocaine pipes, aluminum foil with marijuana residue, a nonworking postal scale, another scale, the defendant's driver's license and firearm identification card, a joint tax return, and eighteen Polaroid photographs. The photographs depicted the defendant in various sexually explicit poses. In another upstairs room, in a gun cabinet, the police seized two packages of fireworks.

2. *The introduction of the photographs.* The Commonwealth indicated prior to trial that it would seek to admit all eighteen photographs. In response, the defendant filed a motion in limine. Following a hearing, the trial judge excluded all but three photographs. Although the Commonwealth sought to introduce the three photographs as exhibits, after an unrecorded sidebar conference, only two of the photographs were marked as exhibits and admitted in evidence for the jury's deliberations. In each of the two photographs, the defendant is naked, posing with an object in her hands and displaying the object vis-à-vis her body in a sexually provocative way. The objects being held appear blurry in the pictures. When confronted with the photographs during cross-examination, the defendant described the objects as a cigarette lighter and a billy club; the Commonwealth inferred from its scrutiny that the objects were a handgun and a shotgun. However, as to the latter, the Commonwealth concedes that, even assuming that the object is a shotgun, it is not the same shotgun that was standing in the bedroom and that was the subject of the unlawful storage charge.

The overarching principle is that "[t]he admissibility of photographic evidence is left to the discretion of the trial judge, and [an appellate court] will overturn the judge's decision only where a defendant is able to bear the heavy burden of demonstrating an abuse of that discretion." *Commonwealth* v. *Waters*, 399 Mass. 708, 715 (1987). Such judicial discretion has a wide berth, as the trial judge is best positioned to determine evidentiary value and to balance the probative value and relevancy against prejudicial effect. However, notwithstanding

this wide latitude, there still are "rare instances in which the probative value of the evidence is overwhelmed by its inflammatory potential." *Commonwealth* v. *Repoza*, 382 Mass. 119, 128 (1980). In this case, we determine "[w]hether sexually explicit photographs . . . '[were] so inflammatory as to outweigh their probative value.' " *Commonwealth* v. *Halsey*, 41 Mass. App. Ct. 200, 203 (1996), quoting from *Commonwealth* v. *Hrycenko*, 31 Mass. App. Ct. 425, 431 (1991). The defendant objected to the admission of the photographs and, thereby, preserved the issue for appeal. Accordingly, we seek to determine whether there was prejudicial error. See *Commonwealth* v. *St. Peter*, 48 Mass. App. Ct. 517, 523 (2000). We conclude that the answer to that question is in the affirmative. In the balance to be struck, the extraordinary prejudice far overbore the minimal probativeness.

A. *Probative value.* We begin with an assessment of the evidentiary probativeness of the photographs. As noted, the objects being held by the defendant in the photographs are murky, but, even if viewed by the Commonwealth's lights, and even assuming such additional candle power would have led the beholder to perceive a shotgun of some sort being held in one photograph, it is not, as the Commonwealth concedes, the shotgun identified in the improper storage charge.[3] The Commonwealth, therefore, concedes that neither photograph was relevant to the wrongful storage of a firearm charge and concedes error in admission on that basis. Instead, the Commonwealth argues on appeal, as the sole basis for admission, that the photographs were probative of the defendant's control of the upstairs bedroom where the marijuana, scales, and crack pipes were found.

We note at the outset that there was no dispute that the room was the defendant's bedroom and, in effect, belonged to her. As the prosecutor put it in the closing: "This, ladies and gentlemen, is her room; and there's no question about that. And these things were found in her closet; there's no questions about that,

---

[3]An officer testified that the husband, an avid hunter, told the police during the original fire survey that the shotgun belonged to him — a statement consistent with the husband's ownership of thirty or so other firearms stored in a gun cabinet. The husband was ordered to surrender the guns when the c. 209A order issued.

in her bureau, throughout her things; there's no question about the possession, ladies and gentlemen, no question." Precisely so, the defendant's general control over, and association with, the bedroom was well-established by abundant evidence — wholly apart from the photographs. This other evidence included the defendant's clothing, both stored in bureaus and strewn about the bedroom, as well as her driver's license, firearm identification card, and tax return, all of which were found within the bedroom. See *Commonwealth* v. *Rarick*, 23 Mass. App. Ct. 912, 912-913 (1986) (personal effects belonging to the defendant linked her to contraband found in proximity to those effects even though multiple persons shared the dwelling). The strength of this other connective evidence substantially diminished the probative need for introduction of the sexually explicit pictures on the issue of general control of the bedroom, which was not even being disputed. Put another way, that this was the defendant's bedroom was fairly obvious, and the photographs added little but prejudice.

The principal issue with respect to control was limited to the defendant's absence from the house for the five days she stayed with her mother.[4] Given this sojourn, there was a question, it appears from the evidence, as to whether someone else may have used the bedroom for some sort of partying and drinking spree. Indeed, that someone else was in the bedroom during this period might have been inferred from an empty bottle of whiskey and a pizza box which, according to the defendant, were not there before she left for New York, and the fact that, before she left, the photographs were kept in her locked closet. This and other evidence suggest that the defendant did not have control of the room during her absence and that the defendant's estranged, alcoholic husband may well have gone on a drinking binge in that room.

[4]There was conflicting evidence about who slept in the bedroom and who slept on the downstairs couch when the defendant and her husband fought and whether the husband's clothes were stored in the bureau where the marijuana was found — all of which revolved around the suggestion of joint control by the defendant and her husband. But, in actuality, this was a diversionary issue because the defendant never disputed that it was her bedroom and that, apart from the five days, she had general control over it. Again, the core of the matter precisely involved the defendant's five-day absence from that bedroom.

Given this lapse in the defendant's control, the probative value of the photographs, if any, is to be analyzed with respect to this five-day period. Any such probative link between the photographs and this period of time was extremely weak. There was no evidence, and the four corners of the photographs do not manifest, that the pictures were taken within the five-day time frame. Nor was there any evidence that the photographs were taken in the bedroom area where either the drugs or paraphernalia were found or in the corner of the room where the shotgun was standing. Further undercutting the Commonwealth's contention that the photographs showed the defendant's association with, and control over, the bedroom is a handwritten notation, "George's house," on the face of one of the photographs, which suggests that the pictures were taken someplace else.[5] In fact, there was no substantive evidence whatsoever linking the photographs to control of the bedroom by the defendant during her five-day absence. Rather than such authentication, the photographs were simply dropped in evidence as items seized in the search and were not further authenticated by time, place, or manner during the course of trial. "To be admissible in evidence, a photograph must be shown to be accurate and bear enough similarity to circumstances at the time in dispute to be relevant and helpful to the jury in its deliberations." *Henderson* v. *D'Annolfo*, 15 Mass. App. Ct. 413, 428 (1983). Thus, on a sliding scale, the probative value of the photographs was minimal. We next consider the prejudice.

B. *Prejudicial effect.* In this case, the prejudicial effect was depicting the defendant as "a lewd [woman] and to lead the jury to believe that a [woman] of [her] character would be likely to commit the crimes charged." *Commonwealth* v. *Ellis*, 321 Mass. 669, 670 (1947).[6] It does not take much imagination to conjure that the purpose and effect of the introduction of the

---

[5]The reference to "George's house" is consistent with the representation of defense counsel, at the hearing on the motion in limine, that the photographs were taken at a different location.

[6]Given our determination of the inherent prejudice in the photographs' admission, we leave to one side the additional prejudicial gloss flowing from the manner in which the prosecutor referenced them in closing. As previously noted, when confronted with the photographs during cross-examination, the

pictures was so that the jury, appalled by the defendant's posing in such a manner, might be swayed to perceive the defendant as not of good moral character and more likely to have committed criminal offenses. See Liacos, Brodin & Avery, Massachusetts Evidence § 11.6, at 708 (7th ed. 1999). Such a prejudicial effect, inherent in sexually explicit depictions, was amplified in this case because the trial did not involve a sex-related offense. Moreover, although only two photographs were published to the jury, one of the officers testified that there were eighteen such Polaroid photographs seized. See, e.g., *Commonwealth* v. *Allen*, 377 Mass. 674, 680 (1979) (photograph of the victim's bloody crotch, which was due to natural decomposition, possessed "great potential for inciting jury speculation about possible sexual overtones to the crime" in a murder trial); *Commonwealth* v. *Darby*, 37 Mass. App. Ct. 650, 654 (1994) (photograph of the male defendant in a sexually turgid state was unduly prejudicial where impotence or sexual dysfunction was not "directly or inferentially" relevant to the case).[7] As a last resort, the Commonwealth suggests harmless error should cause us to affirm the convictions, but we are unable to say the photographs did not unduly and unfairly influence the jury, or had just a slight effect. In sum, the risk was great that the sexually suggestive pictures, which had little to do with the case at hand, unduly swayed the jury. For these reasons, we conclude that it was error to admit the photographs.

---

defendant denied that she was holding firearms and said that the objects were a cigarette lighter and billy club. There was no other testimonial evidence on this point. Notwithstanding that, the prosecutor in closing argued to the jury. "And I would suggest to you, you look at the pictures, certainly, she's got a handgun there, certainly, she's using a handgun, for what purpose, I don't know. But she's using a handgun. Secondly, she's using something that looks like a gun, at least she's holding it like a gun."

[7]The Commonwealth seeks to distinguish cases in which the erroneous admission of provocative and sexually charged evidence has led to reversal on the basis that the other cases concerned "prejudicial evidence of a sexual nature in cases charging sex offenses." See, e.g., *Commonwealth* v. *Yelle*, 19 Mass. App. Ct. 465, 469-470 (1985); *Commonwealth* v. *LaSota*, 29 Mass. App. Ct. 15, 23-28 (1990); *Commonwealth* v. *Hrycenko*, 31 Mass. App. Ct. 425, 430-432 (1991); *Commonwealth* v. *Darby*, *supra*. To the contrary and viewed another way, the error found in these cases is enhanced here because, in the other cases, there was at least a probative link to the sex-related offenses charged. In contrast, because sex-related charges were not at issue here, there is no such link.

3. *Proper appeal.* The Commonwealth contends that the six convictions placed on file (see note 1, *supra*) are not properly the subject of review in this appeal. The general rule is that we do not consider appeals from convictions placed on file "since no appeal may come before [the courts] until after judgment, which in criminal cases is the sentence." *Commonwealth* v. *Delgado*, 367 Mass. 432, 438 (1975). However, that general rule is subject to a qualification in cases that present exceptional circumstances, such as where the legal error affects all the charges and there is a commonality of effect flowing from the error. See, e.g., *Commonwealth* v. *Calderon*, 431 Mass. 21, 28 (2000) (reviewing and reversing other convictions placed on file where reversal was warranted due to the improper exercise of a peremptory challenge, which would have infected the entire trial process); *Commonwealth* v. *Doe*, 8 Mass. App. Ct. 297, 298 n.1 (1979) (challenged issues were "largely common to all the indictments," even for those convictions that were placed on file); *Commonwealth* v. *O'Brien*, 30 Mass. App. Ct. 807, 807 n.1 (1991) (holding regarding an invalid search warrant applied to both indictments, although one had been placed on file). Such exceptional circumstances exist in this case, because we cannot say with any confidence that the jury was not unfairly influenced by the erroneously admitted photographs in reaching its verdicts on all of the offenses, including the filed convictions. Thus, because we believe this case falls within the narrow exception of the aforesaid cases, we reverse all the convictions.

4. *The motion to suppress.* The defendant challenges the denial of her motion to suppress the crack cocaine pipe found on her person during the patfrisk.[8] The issue is to be analyzed in light of the specific and articulable facts of which the officer was aware as he approached the defendant. These facts included

[8]The Commonwealth asserts that we should not address the motion to suppress because the conviction related to the discovery of the crack cocaine pipe was filed. The Commonwealth is incorrect. There was only one charge for, and one conviction under G. L. c. 94C, § 34, of, possession of a class B substance, cocaine. The defendant was sentenced on that offense (the cocaine residue discovered on the two crack cocaine pipes seized in the house was not the subject of separate charges). Thus, it would appear that the only cocaine conviction had to relate to the pipe found on the defendant's person. In any event, for the reasons previously stated, we would reach this issue even if the conviction had been filed.

information of a breaking and entering into a house that had been secured by police and a direct one-on-one identification by a neighbor of the defendant as being involved in that break-in. Further, upon arrival on the scene, Sergeant McCarthy had seen a male being detained by another officer in front of the house, and McCarthy knew that there was another person involved. According to the testimony of Sergeant McCarthy at the suppression hearing, he detained the defendant, handcuffed her, and frisked her because, having been dispatched to investigate a house break, he was concerned for his safety and that of others, including the neighbor (McCarthy did not know the house belonged to the defendant). We conclude that these facts and the inferences drawn therefrom constituted reasonable suspicion justifying the stop and the frisk.[9]

The defendant also argues that the search was invalid because the trial judge dismissed the breaking and entering count on the basis that a person cannot be prosecuted for breaking and entering into one's own house. Hence, the defendant argues, the search was invalid because the break-in charge was invalid. But, dismissal of that charge does not negate the validity of the investigatory stop and frisk. Furthermore, the judge found that the arrest was not based on just the attempted breaking and entry, but also was precipitated by discovery of the crack cocaine pipe in the defendant's pocket. This finding was supported by evidence that the arrest followed the discovery of the pipe. Accordingly, the motion to suppress was rightly denied.

The judgments of convictions on all the complaints tried are reversed and the verdicts are set aside. The denial of the motion to suppress is affirmed.

*So ordered.*

---

[9]That handcuffs were employed does not convert the initial stop into an arrest requiring probable cause. See *Commonwealth* v. *Gordon*, 47 Mass. App. Ct. 825, 826-827 (1999) (handcuffing and placing defendant in police cruiser, without probable cause to arrest, did not take investigation "beyond the proper contours of a threshold inquiry").