Agnes, A.J.
The defendant, Angel Figueroa, is charged with Trafficking in Cocaine, a class B controlled substance and conspiracy. He has filed a pretrial motion to suppress physical evidence seized by the police, statements he made to the police, and the results of a voice identification procedure conducted by means of a cellular telephone. Based on the evidence presented at the hearing on the defendant’s motion, I make the following findings of fact and rulings of law.
FINDINGS OF FACT
Trooper Marion Fletcher is a 15-year veteran of the Massachusetts State Police assigned to the Special Narcotics Investigation unit of the Attorney General’s Office. Her experience includes 4 years as a local police officer and 10 years as a road trooper. She has extensive experience in all aspects of narcotic drug investigations having attended specialized courses offered by the Massachusetts State Police, the federal Drug Enforcement Administration and others, and having participated in hundreds of narcotic drug investigations. Trooper Gregory Desfosses was assigned to the Special Narcotics Investigation unit of the Attorney General’s Office in July 2001. He has carried out between 20-30 undercover drug investigations.
In the fall of 2001, trooper Fletcher was involved in a narcotic drug investigation. The target was a male known as ‘Tony.” His exact identity was unknown. Trooper DesFosses was serving as the undercover purchaser of narcotics. He had the means to contact Tony by cell phone and by pager, but had not met with him face to face. He had occasion to talk to Tony 10-15 times during the course of the investigation. Tony spoke English and responded to messages left by trooper DesFosses on his cell phone in English. On November 19, 2001, he arranged for a purchase of approximately 49 grams of cocaine for $1800 from Tony. Tony called him on his cell phone and confirmed the deal. Tony choose the location advising him specifically that another location selected by trooper Des-Fosses had too many “cops” nearby. When trooper DesFosses was approaching the agreed-upon location, he received a call from Tony who informed him that “his boy” would be attending the delivery in his place. Trooper Fletcher was serving as a surveillance officer with responsibility to attempt to identify who was delivering drugs, and to monitor the activities of undercover police officers. She was in radio and cell phone communication with trooper DesFosses.
*46 The “meet location” was the parking lot of a Market Basket store on the Lowell-Dracut line. She arrived 15 minutes before the time set for the delivery and set up surveillance. At approximately 5:00 p.m., she observed trooper DesFosses arrive. Shortly thereafter, she observed a black, Geo Tracker vehicle, Mass. Registration number 3139XB, drive into the parking lot and signal to trooper DesFosses to enter the vehicle. He did by getting into the back seat. He told the occupant, later identified as Radmus Davila, that he didn’t care to ride in the back seat. After some difficulty, trooper DesFosses was able to explain that he wanted to ride in his own vehicle. The pair exited Davila’s car and entered DesFosses’ car. There a telephone call was placed to Tony and trooper DesFosses explained his reluctance to ride in Davila’s car and asked to lower the price by $100. Trooper DesFosses then heard a conversation between Davila and (presumably Tony) in Spanish. Trooper DesFosses then exited the vehicle, entered his own vehicle and followed Davila who drove away in the Geo Tracker. Trooper Fletcher made observations of these maneuvers and followed the two cars. She was able to confirm that the driver of the Geo Tracker was Radmus Davila, the registered owner of the vehicle, by viewing his image as it appeared in a Registry of Motor Vehicles computer system.
Trooper Fletcher followed the two vehicles to a residential location on Willard Street in Dracut. Davila stopped his motor vehicle and opened the hood as if he was having engine trouble. Davila entered trooper DeFosses’s car and then exited, got back into his Geo Tracker and drove away. Trooper Fletcher could not follow him, but she did debrief Trooper DesFosses who turned over to her a quantity of a white, rock-like substance he had purchased from Davila. She conducted a field test of the material which tested positive for cocaine. He said that he and Davila had a disagreement over whether the price was $1700 or $1800. Trooper DesFosses told her it was difficult to communicate with Davila who spoke primarily Spanish which trooper DesFosses did not speak. To clear things up, trooper DesFosses said he called ‘Tony” on a cell phone. Davila then returned the $100 to him.
By January 2, 2002, the police had located Davila’s residence by a process of trial and error in which they drive around until they spotted his Geo Tracker at 7 Wildwood Street in Dracut. On that day, trooper Fletcher received information that trooper DesFosses had talked with Tony and arranged for a second delivery at the same Market Basket location. It was during the conversation between trooper DesFosses and Tony that Tony said he suspected him of being an undercover police officer. Nonetheless, trooper DesFosses was able to talk his way clear to arranging for another sale of approximately 14 grams of cocaine at 7:00 p.m. She had Davila’s residence under surveillance and saw the Geo Tracker leave the driveway. She followed it to the Market Basket parking lot. Davila followed the same routine as before and trooper Fletcher followed the two cars to a remote street where the exchange occurred as before. After Davila left the scene she again debriefed trooper DesFosses who told her he purchased an additional quantity of what appeared to be cocaine from Davila for $1,000. The material he purchased consisted of a glassine bag containing 27 smaller bags containing a white powdery substance in amounts referred to as “40’s” or “80’s” and consisting of between V2 to 1 ounce of cocaine. Once again, she field tested the material and it tested positive for cocaine.
The following day, January 3, 2002, trooper Fletcher received information that Davila was no longer driving the Geo Tracker, but instead was driving a brown Oldsmobile (Mass. Reg. 2506 VR).
On January 4,2003, the state police managing this investigation came to the conclusion that Davila and Tony were aware that they were the subjects of a police investigation.[1] A decision was made to bring the investigation to a close. Trooper Fletcher was ordered to go to 7 Wildwood Street and wait for Davila. She arrived at the location at approximately 11:30 a.m. and set up surveillance. She was alone in an undercover vehicle, and in civilian clothes. A second trooper was some distance away in another vehicle. At approximately 1:30 p.m. she saw a brown Oldsmobile drive past her and pull into a space. The driver of the vehicle exited. She got out of her car and walked briskly toward the Oldsmobile. She did not recognize the driver, but did recognize the occupant as Davila. By the time she got close to the Oldsmobile, the driver had exited as well. She addressed him by saying “Hey, how you doing.” She used this ruse in an effort “to slow things down” because she knew Davila typically entered his apartment through a nearby back door and she did not see trooper Smith or any other police officer in sight. She did not draw her weapon. The driver, later identified as the defendant Angel Figueroa, smiled and replied “Do I knowyou?” She responded “Sureyou do,” and approached closer. In the next breath she said “State Police, put your hands on the car” and displayed her badge. She took this action because she intended to arrest the passenger, Davila, and thought it was necessary to control the movements of his companion who could be an accomplice. There was no indication that the defendant was armed or involved in any criminal activity.
Davila was ordered to get back into the automobile. She pat frisked the defendant and felt a bulge in his rear pocket. She saw what appeared to be a wallet. She pulled out a tri-fold wallet.[2] She took this action because she believed a firearm could be secreted in a wallet. This belief was based in part on an oral report she had received from other state police officers that in turn was based on an email from a trooper who at the time was serving in the United States military and who had learned about easily concealed, miniature *47 weapons as part of his post-September 11,2001 training. According to the report (a written copy of which is attached to the Commonwealth’s Preliminary Memorandum of Law)[3] there was a miniature, stainless steel, single-shot pistol (“The Downsizer”) for sale in some states, but not in Massachusetts, Connecticut, New York, or Maryland that is no more than 314 inches in length (“smaller than a playing card”). Her decision also was based on her own post-September 11, 2001 terrorist training in which she learned about a variety of blades and cutting tools that could be secreted in objects such as wallets. Her testimony is that she squeezed the wallet in an effort to determine whether it contained a miniature weapon, and as she did so it flipped open and the defendant’s license inadvertently became exposed to her view. I do not credit this part of her testimony. Instead, I find that trooper Fletcher opened the wallet, revealing its contents to the extent that she was able to read the name on the defendant’s license. When she saw that the name on the license was “Figueroa,” she thought she recognized it. She asked him “Where do you live, 16 Walnut Street? Second floor, right?” The defendant replied, “Yes.”
Trooper Fletcher had previously learned that 16-18 Walnut Street was the location of the supplier ‘Tony” in this investigation by tracing a telephone call that came back to one “Carlos Diaz” at that address. Trooper Fletcher had conducted surveillance and monitored traffic at that address as well. Before, her encounter with the defendant on January 4th, she had written 16-18 Walnut on a piece of paper. See exhibit 3. Trooper Fletcher removed Davila from the vehicle, put him in handcuffs, and advised him of his Miranda rights in English. He did not appear to understand what had been said. The defendant stated that Davila did not understand anything because he only spoke Spanish. The defendant agreed to translate the Miranda warning from English to Spanish for Davila’s benefit and did so as Trooper Fletcher read them aloud. Davila responded by stating “Si, I understand; yes, I understand.”
Trooper Fletcher then walked the pairDavila in handcuffs and the defendantover to her undercover vehicle. She put Davila into the back seat of her vehicle and put him inside the seat belt. She then asked the defendant if he had any weapons on his person and he replied “no” with a movement of his hands. She noticed a bulge in his pocket as he did so. She asked him what it was but received no answer. The defendant reached into his pocket and removed a cell phone. The defendant said “it’s his, not mine.” The cell phone was received in evidence as exhibit 4. She asked the defendant if he had anything else, and her pat frisk revealed an object that turned out to be a beeper. Again, the defendant said “it’s his, not mine.” The beeper is in evidence as exhibit 5. A second beeper and cell phone were later discovered in the front passenger seat area of the Oldsmobile as a result of an inventory search. See exhibit 6 & 7.
By this time, trooper Smith had arrived. Because it was such a cold day, the defendant was allowed to sit in trooper Smith’s vehicle. Trooper Fletcher contacted trooper DesFosses and asked him to telephone Tony’s beeper and put in “all one’s.” He did so and she observed the numeral one appear in a series on the beeper that was removed from the defendant’s person. Trooper Fletcher also asked trooper DesFosses to place a telephone call to Tony’s cell phone. She observed the cell phone recovered from the defendant’s person display the incoming call from trooper DesFosses. Finally, trooper Fletcher told trooper DesFosses that she “had two people” and thought one might be Tony. She asked trooper DesFosses if he could recognize Tony’s voice if he heard it. He said he could. Trooper Fletcher told the defendant to speak into the cell phone and say, “Hello, who is this?” He did. She took the phone back, walked a short distance away and asked trooper DesFosses if he recognized the voice. He asked if the speaker could speak again slowly. The defendant complied. Trooper DesFosses then told trooper Fletcher “I think it’s him.” After that, trooper Fletcher was instructed to dial a particular number on her cell phone, but not to say anything and just listen to the voice mail. She did so and recognized the voice as that of the defendant. Another trooper who arrived on the scene, trooper Babbit, had seen images of the person allegedly known as Diaz at 16-18 Walnut Street from records maintained by the Massachusetts Registry of Motor Vehicles and recognized the image as that of the defendant.
The entire episode from the moment that trooper Fletcher approached the Oldsmobile until the formal arrest of the defendant took about one hour from about 1:30 p.m. to 2:30 p.m. The defendant was later booked at the Lowell Police Department about 3:50 p.m.
DISCUSSION
1. Authority to Detain Defendant Before Arresting Davila
Based on the facts known to trooper Fletcher at the time she encountered the Oldsmobile on January 4, 2002, there was probable cause to arrest Davila for trafficking in cocaine. Whenever the police make an arrest, they have a right to take reasonable measures for their own safety. In determining whether the police action was reasonable and proportional to the justification (the arrest of a person for a felony level, drug trafficking crime) and dangers involved, there are no bright lines; rather, the need for the police action must be balanced against the extent of the intrusion. Commonwealth v. Torres, 433 Mass. 669, 672 (2001); Commonwealth v. Borges, 395 Mass. 788, 794 (1985). The presence of another unidentified male in the vehicle in which the person to be arrested was a passenger created an added risk for trooper Fletcher. *48 It was reasonable for trooper Fletcher to detain him, and order him to put hands on the vehicle (or stand still with hands visible) in order to keep him within her view and in a safe position as she proceeded with the arrest of Davila, and to guard against sudden movements that could pose a threat of harm or be misunderstood as aggressive in nature while she effectuated the arrest of Davila.
Trooper Fletcher’s order was comparable to an exit order to a driver or passenger which is permitted when the police face a legitimate threat to their safely. Commonwealth v. Torres, 433 Mass. 669, 673 (2001). See Commonwealth v. Santana, 420 Mass. 205, 212-13 (1995). See also Commonwealth v. Stampley, 437 Mass. 323, 325-30 (2002) (“The justification for an exit order does not depend on the presence of an ‘immediate threat’ at the precise moment of the order, but rather on the safety concerns raised by the entire circumstances of the encounter”); Commonwealth v. Gonsalves, 429 Mass. 658, 664 (1999) (“[I]t does not take much for a police officer to establish a reasonable basis to justify an exit order or search based on safety concerns . . .”).
2. Authority to Conduct a Pat Frisk of the Defendant
A pat frisk is a search or seizure within the meaning of Article 14 of the Declaration of Rights and must be supported by articulable facts and circumstances that support the belief that the subject is armed and potentially dangerous. Commonwealth v. Rock, 429 Mass. 609, 612 (1999); Commonwealth v. Silva, 366 Mass. 402, 405 (1974). The test is an objective one. Commonwealth v. Santana, 420 Mass. 205, 208-10 (1995). A pat frisk cannot be justified as a routine incident of every encounter between a citizen and the police. See Commonwealth v. Cardoso, 46 Mass.App.Ct. 901 (1998) (rescript); Commonwealth v. Davis, 41 Mass.App.Ct. 793, 796 (1996); Contrast, Commonwealth v. Prashaw, 57 Mass.App.Ct. 19 (2003).
In Commonwealth v. Wing Ng, 420 Mass. 236, 237-38 (1995), the Supreme Judicial Court rejected the argument that the police enjoy an automatic right to pat frisk the companion of one who has been lawfully arrested, and said emphatically that such an action must be based on independent grounds to support a belief that the officer’s safety is at risk. Similarly, in Commonwealth v. Souza, 42 Mass.App.Ct. 186, 191, rev. den., 424 Mass. 1107 (1997), the Appeals Court ruled that the police had no justification for pat frisking an individual who was present in an apartment when police conducted a search for drugs. Contrast, Commonwealth v. Calderon, 43 Mass.App.Ct. 228 (1997).
In the present case, trooper Fletcher acted prudently in ordering the defendant to stop and put his hands on the car. This maneuver separated the defendant from the person to be arrested, and exposed the defendant to her visual scrutiny. The order to put his hands on the car was likewise reasonable. See Commonwealth v. Fraser, 410 Mass. 541, 544 (1991) (police officer’s order to remove hands from pockets did not convert an encounter into a seizure within the meaning of the Fourth Amendment or Article 14).
The defendant argues that based on the fact that there was no evidence of his involvement in criminal activify, no indication of any furtive movements, and no other reason to believe he was armed, trooper Fletcher had no right to go any further than a simple detention order. The only explanation for her decision to go further and conduct a pat frisk, according to the defendant, was a hunch that the defendant was in fact “Tony,” the target of the soon-to-be-concluded investigation. A hunch that proves to be correct does not support the Commonwealth’s burden of establishing that a search or seizure was constitutionally reasonable. See Commonwealth v. Shields, 402 Mass. 162, 164 (1988). An exit order, a detention order or a pat frisk also cannot be based simply on the fact that a person appears to be nervous. Commonwealth v. Torres, 433 Mass, at 673. However, it “does not take much for a police officer to establish a reasonable basis to justify ... a search based on safely concerns.” Id. at 673, quoting Commonwealth v. Gonsalves, 429 Mass, at 664. In Massachusetts, “the standard for a pat frisk is the same as the standard required to justify an order to the occupants of a vehicle stopped for traffic violations to leave the vehicle.” Commonwealth v. Torres, 433 Mass. 669, 676 (2001). In other words, if the police are justified in ordering one or more occupants to step outside of a vehicle or to stop once having exited the vehicle for the officer’s safety to enable the officer to focus on making an arrest of another occupant, the police have a right to conduct a pat frisk of those other occupants.
The Commonwealth’s position finds some support in Commonwealth v. Wing Ng, supra There, the police had a warrant for the arrest of John Ng for a home invasion in which he and three other Asian males tied up and viciously beat the occupants and stole a gun. The police received information that John, his brother, and other men were at a restaurant in Cambridge and that they were traveling in a silver Subaru. Police surveillance was established and the suspect, in the company of other Asian males and females, was observed leaving the restaurant. The police followed the group to another restaurant in Boston. A decision was made to converge on the car as soon as the suspect entered it. Id. at 239-40.
As soon as the group left the second restaurant and entered the vehicle, the police approached it with guns drawn and ordered all of the occupants to step out. The defendant, Wing Ng, had been seated in the driver’s seat. After he identified himself, he was placed face down on the ground and pat frisked. An automatic weapon was removed from his person. In affirming the *49 Appeals Court which had overruled the motion judge’s allowance of the defendant’s motion to suppress the Supreme Judicial Court explained that a reasonable police officer had grounds to suspect that the defendant might be armed and a threat to the officers based on the following factors: (1) the arrest was for a violent felony, (2) the home invaders were armed and a firearm had been stolen from the home, (3) the defendant was the suspect’s brother and seemed to be on good terms with him. The Court concluded that it was reasonable for the police to infer that the defendant was one of the armed men. Id. at 241. The test has been described as a “totality of the circumstances” approach, see 4 W.R. LaFave, SEARCH AND SEIZURE §9.5(a) at 262-70 (West Pub. Co. 1996 & Supp. 2004), and that describes the approach taken by the Supreme Judicial Court in Wing Ng.
While Wing Ng is not a perfect fit, it does lend support to the Commonwealth’s position that trooper Fletcher, who was alone, see, e.g., United States v. Proctor, 148 F.3d 39, 42 (1st Cir. 1998), had an objective basis to be concerned for her own safety. She was faced with a situation in which the person to be arrested was to be charged with a felony that carries a mandatory minimum sentence, she knew that his “boss”the English-speaking person with whom trooper DesFosses had dealingswas at large and apparently aware that the police were closing in on him, and she was warranted in the belief that drug trafficking is a crime that often is associated with the use of firearms. While this case is close, I will assume for purposes of the analysis of the issues that it was not overly intrusive for trooper Fletcher to pat frisk the driver in order to secure the situation and to prepare for the arrest of Davila.
3. Authority to Conduct a Search Following the Pat Frisk and to Remove and Inspect the Defendant’s Wallet
During a pat frisk, the police have no right to remove a man’s wallet for a more detailed inspection simply because the officer believes that a miniature weapon could be located within it. The wallet was not removed because it appeared to be or to contain a hard object that was or could be a weapon or contraband. Rather, it was removed specifically because of the bulletin communicated to trooper Fletcher about the availability of miniature weapons that could be used by terrorists. However, there was no evidence that such weapons had ever been found in Massachusetts. The theory espoused by the Commonwealth would justify the routine opening and inspection of nearly every sort of personal container including credit card holders, note paper holders, wallets of all sizes and shapes, purses, pens and a variety of other small containers (pill bottle, makeup kit, key container, glass case etc.) that persons typically carry, as an incident to a pat frisk, because it is possible that a miniature weapon could be secreted inside such an object. See United States v. Campa, 234 F.3d 733 (1st Cir. 2000) (“Although we recognize that searching by means of a pat-down is not an exact science, the government does not even argue that Trooper Marrón thought appellant’s walletthe item particularly at issue herecould be a weapon. He simply removed every bulging object as he searched, undoubtedly a convenient method for detecting weapons, but one that goes beyond the limited invasion of privacy authorized by Terry and its progeny”). The potential that an individual may be concealing a miniature weapon in a personal container such as a wallet, without more, is not sufficient to establish an objective basis for the belief that the individual is armed and a threat to the safety of the officer. See generally 4 W.R. LaFave, SEARCH AND SEIZURE §9.5(e) (West Pub. Co. 1996 & Supp. 2004).
The Commonwealth derives no support from the recent decision in Commonwealth v. Pagan, 440 Mass. 62 (2003), where the Supreme Judicial Court held that during a Terry stop in which an officer has a legitimate suspicion that the suspect is armed and dangerous, certain containers in his possession or under his control may be opened and inspected without first performing a pat frisk of the exterior. In Pagan, the suspect was carrying a knapsack that was filled with heavy, hard objects and a pat frisk of the exterior would not enable the police to determine whether it contained a weapon. Id. at 71. Pagan does not stand for the proposition that the police have a right to remove, open and inspect every object or container that they feel or discover on one’s person during the course of a pat frisk. In fact, in Pagan, the Court specifically pointed out that in the case of soft, pliable containers (e.g., a wallet), a pat frisk of the exterior should be sufficient. Id. at 69, citing People v. Corpany, 859 P.2d 865, 871 (Colo. 1993).
In Commonwealth v. Pagan, supra, the court reaffirmed the general rule that a pat frisk is a limited search that may not exceed “what is minimally necessary to learn whether the suspect is armed and to disarm him once the weapon is discovered.” Id. quoting Commonwealth v. Almeida, 373 Mass. 266, 272 (1977) (citation omitted). Only when a pat frisk is not capable of informing the police whether an object or container is or contains a weapon, may the police dispense with it and simply open the container.
While there may be no hard and fast rule that turns exclusively on the nature of the container or object, the Court added that “(i]t may be that for many, and perhaps most containers made of soft material, a pat frisk will provide additional information supporting or eliminating an officer’s reasonable suspicion that a weapon may be hidden within.” Id. In the present case, trooper Fletcher did not open the defendant’s wallet, based on its character as a hard object, in order to dispel her suspicion that it contained a weapon. Rather, trooper Fletcher opened the defendant’s wallet *50 because of the possibility it might contain a miniature firearm. To uphold the search of the defendant’s wallet on that basis would be to establish a bright line rule that would authorize the police to open virtually every container or object carried by or on a suspect’s person. Such a rule would be in direct conflict with the Court’s observation in Pagan that “the specific circumstances will dictate what measures, including but not limited to a preliminary pat frisk, will satisfy” the constitutional standard. This is in keeping with the observation of United States Supreme Court Justice Anthony Kennedy from his dissenting opinion in Maryland v. Wilson, 519 U.S. 408, 422 (1997), and endorsed by the Supreme Judicial Court in Commonwealth v. Gonsalves, 429 Mass. 658, 665 (1999): “ ‘The distinguishing feature of our criminal justice system is its insistence on principled, accountable decision-making in individual cases.’ Bright-line rules, by their nature, tend to eliminate this feature.”
ORDER
Based on the above findings of fact and rulings of law, the removal and inspection of the contents of the defendant’s wallet was unlawful either as a search and seizure that exceeded the scope of a valid pat frisk, or as one not authorized in lieu of a pat frisk to dispel a legitimate suspicion that the defendant was armed and dangerous, and thus was in violation of Article 14 of the Massachusetts Declaration of Rights, and the evidence gained from it (the statements by the defendant, the identifications at the scene by trooper Fletcher and trooper DesFosses, and the physical evidence seized from the defendant’s person) must be suppressed.

 There was no evidence offered to explain the basis of this judgment by the police.

 The wallet is in evidence as exhibit 2.

 The email is in evidence as exhibit 1. It is in the form of an email from Brian Connors to Marion Fletcher dated January 8, 2002, several days after the date of this incident. However, it appears and I find that the source of this email was trooper Donnelly of the Massachusetts State Police who was on active military duty on September 6, 2001. The contents of his email was later reported orally to trooper Fletcher and others prior to January 3, 2002.