## COMMONWEALTH *vs.* ANGEL PAGAN.

Plymouth. February 4, 2003. - August 27, 2003.

Present: MARSHALL, C.J., GREANEY, IRELAND, SPINA, COWIN, SOSMAN, & CORDY, JJ.

*Controlled Substances. Search and Seizure,* Container, Reasonable suspicion, Threshold police inquiry. *Constitutional Law,* Search and seizure, Reasonable suspicion. *Threshold Police Inquiry.*

Police officers who had lawfully stopped an individual, removed his backpack, and pat frisked him were justified, after requesting that the individual produce some form of identification, in searching the backpack for weapons so that it could safely be returned to the defendant for his location and production of identification [66-68]; moreover, in the circumstances, the police officers were not required to conduct a preliminary patfrisk of the exterior of the pack before opening it, where it was evident from looking at and lifting the backpack that it contained hard, heavy objects that could be used as weapons [68-72].

This court concluded that, if a container is such that a patfrisk might suffice to establish that there is no potential weapon within, the container may not be opened by police as part of a search for weapons unless a patfrisk has first been performed; if, however, a patfrisk would not suffice to dispel suspicion and avert the need for a search, no patfrisk need be performed: in each case, the method and scope of an officer's search for reasonably suspected weapons must be confined to what is minimally necessary to discover the presence or confirm the absence of a weapon, and the specific circumstances will dictate what measures, including but not limited to a preliminary patfrisk, will satisfy that standard. [72-73]

INDICTMENT found and returned in the Superior Court Department on June 4, 1999.

A pretrial motion to suppress evidence was heard by *Charles J. Hely,* J., and the case was heard by *Richard J. Chin,* J.

After review by the Appeals Court, the Supreme Judicial Court granted leave to obtain further appellate review.

*J. Thomas Kerner* for the defendant.

*Robert C. Thompson,* Assistant District Attorney, for the Commonwealth.

SOSMAN, J. The defendant appeals from his conviction of traf-

ficking in cocaine, contending that his motion to suppress evidence was erroneously denied. After a remand to the motion judge for further findings, the Appeals Court, in an unpublished memorandum and order pursuant to its rule 1:28, held that the challenged search was lawful and affirmed the conviction. *Commonwealth* v. *Pagan*, 54 Mass. App. Ct. 1115 (2002). We granted the defendant's application for further appellate review, and we now affirm the conviction.

1. *Background.* a. *Facts.* After an evidentiary hearing, the motion judge made the following findings of fact.[1] At approximately 11:30 P.M. on April 11, 1999, a resident of an apartment building at 425 West Elm Street in Brockton dialed 911 to alert the Brockton police to a break-in in progress at that address. The caller reported that two Hispanic males, one wearing a bulky jacket and the other carrying a large bag, were trying to break into the building through a front window. Officers Antonio Randolph and James Coady arrived at the scene within minutes, but saw no one in front of the building. They were familiar with the building (a three-story apartment building with four or five apartments on each floor) and its vicinity, and knew that the Brockton police had responded to numerous calls from that area for a variety of offenses, including violent offenses and weapons-related offenses. The officers gained access to the building and headed up the stairway. On the second floor near the stairway, they saw a gym bag, which they thought might be the bag referenced in the caller's description. Officer Randolph then spotted the defendant, a large Hispanic male, seated on the stairway between the second and third floors. The defendant had a backpack on his back.

Officer Randolph ordered the defendant to stand up, whereupon Officer Randolph removed the backpack and handed it to Officer Coady. The backpack was made of soft material, with one main compartment zippered shut. The backpack and its contents weighed approximately six pounds. It was evident that the pack contained heavy objects. The motion judge found that "anyone could tell just by holding the backpack that there was

---

[1]On remand from the Appeals Court, the judge made supplemental findings based on the evidence presented at the original hearing on the motion to suppress. Our summary includes those supplemental findings.

something heavy and hard inside." After handing the pack to Officer Coady, Officer Randolph proceeded to frisk the defendant, and felt no potential weapons on his person. He asked the defendant for some identification, to which the defendant responded that he did not have any, but the defendant volunteered that he was a police officer in Puerto Rico. Officer Randolph again asked the defendant for identification, adding that a police officer should have some identification. The defendant then said that his identification was in the backpack, and pointed at the backpack, which was still held by Officer Coady.

Officer Randolph instructed Officer Coady to open the backpack and find the defendant's identification. Officer Coady opened the zipper to the main compartment and saw a brick-shaped object (approximately eight inches long, four inches wide, and two inches deep) wrapped in duct tape. Based on his military training, Officer Coady's very first impression was that the object might be a bomb. He took it out, and then saw another identically sized and wrapped object underneath. The second brick was removed as well. Based on their training and experience with narcotics, the officers then suspected that the bricks were kilograms of cocaine.[2] Officer Randolph instructed Officer Coady to cut into the packaging to confirm that they were drugs. After making a small cut through the packaging, Officer Coady confirmed that the interior was comprised of a solid brick of a white substance that appeared to be cocaine. At the bottom of the backpack was the defendant's wallet and identification. The defendant was placed under arrest for possession of cocaine.[3]

Back at the police station, the defendant gave a statement in which he admitted that two unidentified Colombians had asked him to pick up a package in White Plains, New York, and deliver it to Boston, promising to pay him $2,000 for each package delivered. He had made the trip with another man, the

---

[2]Later analysis confirmed that each brick was slightly over 998 grams, just shy of one kilogram.

[3]By the time Officer Coady opened the backpack, a detective had arrived at the scene. Based on evidence presented at trial (but not at the motion to suppress), the defendant contends that there was yet a fourth officer who arrived prior to the search of the backpack. Whether the defendant was outnumbered four-to-one as opposed to three-to-one is of no consequence to our analysis.

codefendant, Jose Cepeda. The two had arrived late at night, and had gone to Brockton to stay with Cepeda's sister. The sister was not home, and they had tried to gain access to her apartment through the window. Cepeda had gone to find a telephone in order to locate his sister, and was off on that mission when the police found the defendant waiting on the stairs. Cepeda was apprehended in Boston several hours later.

b. *Procedural history*. The defendant moved to suppress evidence of the cocaine found in his backpack on the ground that the officers had illegally searched the backpack and slit open the cocaine packaging. He also moved to suppress his later statement on the ground that it was a product of the unlawful search. The motion was denied. The judge ruled that the opening of the backpack would be justified as a limited search for weapons. Given the nature of the reported crime (breaking and entering), the frequency of weapons-related crimes in that area of Brockton, the size and weight of the backpack (which "could easily contain a weapon or a burglary tool that could be used as a weapon"), and the fact that a second burglar was believed to be at large in the vicinity, the judge concluded that the officers would have a legitimate need to open the backpack and ascertain whether there were any weapons inside. While the Commonwealth had relied primarily on the theory that the defendant had given the officers consent to search the pack for identification, the judge's ruling did not adopt that theory. He credited the officers' belief that the defendant had so consented, but assumed (without deciding) that the evidence was not sufficient to support a finding of valid consent. Rather, he denied the motion on the ground that the objective circumstances justified opening the pack as part of a *Terry* weapons search, and that the discovery of what appeared to be contraband inside the pack gave the officers grounds to inspect under the wrapping of that contraband.[4]

On appeal, the defendant acknowledged that the police had the requisite reasonable suspicion for a *Terry* stop, and that the

[4]The judge correctly noted that the legality of the search was to be analyzed based on the objective circumstances confronting the officers, not on their subjective belief that the defendant had consented to the search. See *Commonwealth* v. *Smigliano*, 427 Mass. 490, 493 (1998), and cases cited.

circumstances entitled them to remove the backpack from him and frisk his person for weapons. He contended, however, that the police had no grounds to open or search the backpack itself. Before addressing the weapons search theory relied on by the motion judge, the Appeals Court remanded the matter for further findings on the alternative theory of a consent search. On remand, the judge ruled that the defendant had not voluntarily consented to a search of the backpack, because his "verbal replies and gesture to the backpack" were merely in acquiescence to the officer's demand that he produce identification. See *Commonwealth* v. *Voisine*, 414 Mass. 772, 783 (1993), quoting *Commonwealth* v. *Walker*, 370 Mass. 548, 555, cert. denied, 429 U.S. 943 (1976) (valid consent to search must be "something more than mere 'acquiescence to a claim of lawful authority' "). The judge reiterated his analysis that a search of the backpack was justified as a search for weapons during a lawful *Terry* stop. Considering the matter in light of his supplemental findings, the Appeals Court agreed with the judge's analysis and affirmed the conviction.

2. *Discussion.* Before this court, the defendant properly concedes the legality of the stop itself, the removal of his backpack, and the frisk of his person, but contends that there was no justification for the officers to open the pack. First, he argues that there was a sufficient police presence to keep the backpack itself under police control, preventing him from accessing a weapon (if any) inside it, and thus no need to search the pack. Second, he argues that, if there were any legitimate concern about his accessing a weapon in the backpack, the police were required to pat frisk the backpack before opening it, and that they could not proceed to open the backpack unless that patfrisk confirmed the presence of a weapon or weapon-like object inside.

With regard to the first argument, some courts and commentators have endorsed the proposition that a *Terry* weapons search does not extend to containers if the circumstances permit the police to control the container and keep it away from the suspect. See *United States* v. *Lewis*, 486 A.2d 729, 733 (D.C. 1985); *Berry* v. *State*, 704 N.E.2d 462, 465 (Ind. 1998); *State* v. *Landry*, 393 So. 2d 713, 714 (La. 1981); 4 W.R. LaFave, Search

and Seizure § 9.5(e) (3d ed. 1996). We have similarly found, in a case involving an arrest, that the opening of a bag to search for weapons cannot be justified on grounds of exigency where "the police presence was substantial and the risk of the defendant successfully repossessing the bag was minimal." *Commonwealth* v. *Madera*, 402 Mass. 156, 160 (1988). However, other courts have allowed containers to be opened as part of a *Terry* search for weapons, notwithstanding that the police were present in sufficient force to prevent the suspect from retrieving or reaching into the container. See, e.g., *United States* v. *McClinnhan*, 660 F.2d 500, 504 (D.C. Cir. 1981); *United States* v. *Vigo*, 487 F.2d 295, 298 (2d Cir. 1973); *State* v. *Thompson*, 3 Kan. App. 2d 426, 431 (1979); *Phillips* v. *Commonwealth*, 17 Va. App. 27, 31-32 (1993). As noted but criticized in LaFave, *supra*, the latter approach appears consistent with the United States Supreme Court's allowance of a vehicle search for suspected weapons as part of a *Terry* stop, see *Michigan* v. *Long*, 463 U.S. 1032, 1052 (1983) (police not required to "adopt alternate means to ensure their safety in order to avoid the intrusion involved in a *Terry* encounter").

The facts of the present case do not make police control of the situation as crystal clear as the defendant suggests. Although the defendant was outnumbered by the officers (see note 3, *supra*), a second suspect was still at large, and likely still in the vicinity. While one might be confident that several officers could prevent a single suspect from gaining access to a backpack, the potential that the suspect's cohort (reasonably suspected to be armed) could appear at any moment made the situation far from secure. As the motion judge found, the officers, who had been at the scene for only about three minutes, "were in the *process* of establishing control, but the threat had not been neutralized" (emphasis in original).

We need not resolve whether the presence of several officers sufficed to eliminate the risk of the defendant's retrieving his backpack, or whether the justification for a *Terry* weapons search of the backpack would therefore disappear, because elsewhere the defendant argues that the police should have returned the backpack to him so that he could locate and produce his identification (rather than searching for his

identification themselves). He also concedes that the police would have been entitled to assure themselves that no weapons were in the backpack before they did so. In other words, on the defendant's own theory, the proper course of action would have been to check the pack for weapons so that it could safely be returned to the defendant for his production of some identification. We agree. No matter how many officers are present, the police cannot safely allow a detained suspect to reach inside a container that they reasonably fear may contain a weapon. See *State* v. *Ehly*, 317 Or. 66, 70-73, 81-83 (1993) (suspect looking through gym bag to locate key; suspect properly ordered to stand back while officer emptied contents of bag to check for weapon). Here, the container that could have contained a weapon also contained the identification that the police were asking the defendant to produce.[5] Either the police had to retrieve the identification themselves or, as the defendant acknowledges, the police would have had to confirm that there were no weapons or weapon-like objects in the backpack so that they could safely hand it back to the defendant for his retrieval of identification. See *Commonwealth* v. *Lantigua*, 38 Mass. App. Ct. 526, 528-529 (1995) (officers could search vehicle for weapons prior to allowing defendant to reenter vehicle to get registration, or officers could enter vehicle and retrieve registration from glove compartment).

That brings us to the defendant's second argument, and requires us to decide whether the officer's check of the backpack for weapons could proceed directly to the opening of the pack without first performing any patfrisk of the exterior. On the facts of this case, we conclude that a preliminary patfrisk was not a prerequisite to the officer's opening the backpack.

The purpose behind the protective measures allowed by *Terry* is to enable an officer to confirm or dispel reasonable suspicions that the stopped suspect may be armed with a weapon, thus allowing the officer "to pursue his investigation without fear of

[5]Initially, the police wanted an identification to confirm the defendant's address, as all suspicion of him would dissipate if he could show that he lived at that address. Then, when the defendant claimed to be a police officer, the police also wanted confirmation that he was an officer, a fact that would, if true, also operate to dispel suspicion.

violence." *Adams* v. *Williams*, 407 U.S. 143, 146 (1972). Consistent with that purpose, those measures are "confined to what is minimally necessary to learn whether the suspect is armed and to disarm him once the weapon is discovered." *Commonwealth* v. *Almeida*, 373 Mass. 266, 272 (1977), citing *Commonwealth* v. *Silva*, 366 Mass. 402, 407-411 (1974). While the customary patfrisk is normally sufficient to detect whether a suspect has a weapon on his or her person, there are times when a patfrisk will not be sufficient. See, e.g., *Hodges* v. *State*, 678 So. 2d 1049, 1051 (Ala. 1996) (patfrisk of "hard leather boots" not required prior to removal and search of boots because frisk would not suffice to reveal weapon hidden inside); *People* v. *Sorenson*, 196 Ill. 2d 425, 441-442 (2001) (same, "steel toed" hiking boots).

The same is true of containers, which come in an infinite variety of sizes, shapes, and materials, and we therefore decline to impose a rule that would automatically require a preliminary patfrisk of any and all containers prior to searching them for weapons during a *Terry* stop. There are times when a patfrisk of a container will provide no useful information as to its contents, and will therefore do nothing either to confirm or to dispel an officer's suspicion that there is a weapon inside. An obvious example would be a container with a hard exterior — it would be pointless to pat frisk a cardboard box, or a hard-sided suitcase. See *United States* v. *McClinnhan, supra* (briefcase opened without preliminary frisk). At the opposite extreme is a patfrisk of a small container made of soft material, as a patfrisk of such a container would unquestionably suffice to uncover the presence of any weapon or hard object or to confirm that no potential weapon is inside. See *People* v. *Corpany*, 859 P.2d 865, 871 (Colo. 1993) (where pat-down of "fanny pack" indicated that it did not contain any weapon, further search of fanny pack was not justified as protective search). Where a patfrisk can establish whether a possible weapon is present or not, courts have required a preliminary patfrisk of the container in question. See, e.g., *United States* v. *Vaughan*, 718 F.2d 332, 335 (9th Cir. 1983) (because "[a]ny weapons could have been felt through the cover" of "soft and thin" briefcase, "officers had

no reason to open it to protect their safety"); *State* v. *Coons*, 137 N.H. 365, 367-368 (1993) (where officer emptied and searched eight-inch by nine-inch drawstring bag without first frisking it, search was unreasonable because not confined "to what was minimally necessary to discover the presence of a weapon"). See also *Commonwealth* v. *Sumerlin*, 393 Mass. 127, 128, 130-131 (1984) (patfrisk of bag revealed gun inside); *Commonwealth* v. *Johnson*, 36 Mass. App. Ct. 336, 337 (1994) (gun inside handbag felt during frisk). In such cases, the patfrisk will, if a weapon is present, reveal the presence of a likely weapon and thereby confirm that a more intrusive search is justified. By the same token, a patfrisk of a small, soft-sided container that reveals no hard objects will, by itself, assuage the officer's prior suspicion and avoid the need for any greater intrusion on the suspect's privacy.

However, the mere fact that a particular container is made of soft or pliable material does not necessarily mean that a patfrisk will provide useful or reliable information as to the presence or absence of weapons inside. For example, a patfrisk of a full duffel bag can discern a weapon if that weapon is located near the bag's outer surface, but even the most thorough palpation of such a bag could not detect a weapon or hard object packed deeper in the middle. If an officer has reasonable suspicion that such a container may contain a weapon, performing a patfrisk has no potential to avert the more intrusive search of the interior of the container: if a patfrisk reveals a hard object near the surface, the bag will have to be opened to retrieve it, or, if the patfrisk uncovers no hard object, the bag will still have to be opened to determine whether a weapon is hidden deeper inside. In other words, while a patfrisk may provide added justification for opening the bag, it will not suffice to avoid opening such a bag. See, e.g., *Worthey* v. *State*, 805 S.W.2d 435, 438 (Tex. Crim. App. 1991) (where patfrisk of purse inconclusive, officer acted reasonably in opening purse to check for weapons). In such cases, the level of search that is minimally necessary inevitably involves opening the container. Requiring officers to pat frisk such a container prior to opening it imposes a useless

requirement that does nothing to protect the suspect's privacy.[6]

The container in question in this case, although constructed of pliable material, was full of heavy, hard objects. Simply from looking at it and lifting it (which the officers had done), it was evident that a patfrisk could not possibly suffice to dispel the suspicion that burglarious implements (which could be used as weapons) or other potential weapons were inside.[7] Rather, a patfrisk of the pack would not reveal anything beyond what the officers already knew, namely, that the pack contained hard, heavy objects that could be used as weapons and that the pack would have to be opened to determine what those objects were. See *Berry* v. *State*, 704 N.E.2d 462, 465-466 (Ind. 1998) (search justified where heavy backpack "clunked as if something metal were in it" when placed on patrol car); *United States* v. *Lewis*, 486 A.2d 729, 738 n.2 (D.C. 1985) (Nebeker, J., dissenting) (noting that frisk of knapsack "which contained a number of hard, large articles, such as gym shoes and a radio, would not have sufficed as a security measure"). See also *United States* v. *Flippin*, 924 F.2d 163, 166-167 (9th Cir. 1991) (officer reasonably opened "heavy" makeup bag without first feeling for

---

[6]There may also be times when officers are specifically alerted to the presence of a potential weapon in the container without performing a patfrisk. If the officers already have specific information concerning the presence of such an object in the container, it would be redundant to require a patfrisk of the container. See *People* v. *Ritter*, 54 Cal. App. 4th 274, 280 (1997) (where officer observed outline of handgun in outer compartment of suspect's "fanny pack," officer could search compartment without pat-down); *Berry* v. *State*, 704 N.E.2d 462 465-466 (Ind. 1998) (officers heard "clunk" of something metallic inside pack).

[7]The defendant complains that the judge's findings in this regard are erroneously premised on the results of an imaginary patfrisk of the backpack. At one point in his findings, the judge does envision what the results of a frisk would have been: "If one of the officers had done a pat-down of the backpack before opening it, he would have felt two hard, heavy objects that were the size, shape, density and approximate weight of building bricks. This would have increased rather than decreased the basis for opening the bag to protect against anything that could be used as a weapon." However, the judge also made the finding, supported by the record, that "[d]ue to the weight, size and density of the cocaine bricks, anyone could tell just by holding the backpack that there was something heavy and hard inside." That latter finding is not premised on an imaginary frisk of the backpack, but on what the officers would have known from merely looking at and lifting it.

weapon inside). Particularly where the pack would have to be given back to the defendant in order for him to retrieve his identification, the officers would need to have a high degree of assurance that they were not giving a suspected burglar the opportunity to pull a weapon out of that pack. Given the specific facts concerning this particular stop and this particular container, a patfrisk would not have sufficed to provide that assurance, and opening the pack was the minimum precaution necessary to dispel the officer's legitimate suspicions.[8]

It may be that for many, and perhaps most, containers made of soft material, a patfrisk will provide additional information either supporting or eliminating an officer's reasonable suspicion that a weapon may be hidden within. In such cases, a patfrisk of the container should ordinarily be performed prior to opening the container. With such containers, the patfrisk will either reveal a hard object and justify a further search, or the patfrisk will establish that no hard object is inside, thus dispensing with the need for any further search of the container. However, as here, particular features of the container, readily observable by the police, may make it apparent that nothing short of opening the container will suffice to address the officer's reasonable suspicions. In such cases, we will not require the officers to perform the meaningless ritual of a preliminary patfrisk of the container. Thus, if the container is such that a patfrisk might suffice to establish that there is no potential weapon within, the container may not be opened as part of a search for weapons unless a patfrisk has first been performed. If, however, a patfrisk would not suffice to dispel suspicion and avert the need for a search, no patfrisk need be performed. In each case, the

---

[8]Having discovered what appeared to be two kilograms of cocaine in the backpack, the officers did not need to obtain a warrant before checking underneath the duct tape wrapping to confirm that the bricks were indeed comprised of cocaine. From the outward appearance of the bricks alone, the officers had probable cause to arrest the defendant, and requiring them to obtain a search warrant before making a small cut and looking under the wrapping "would afford insignificant protection to a defendant and would unnecessarily burden the criminal justice system." *Commonwealth* v. *Madera*, 402 Mass. 156, 160 (1998). See *Commonwealth* v. *Straw*, 422 Mass. 756, 762 n.3 (1996), quoting *United States* v. *Corral*, 970 F.2d 719, 725 (10th Cir. 1992) (warrant not required to search container when police "possess knowledge approaching certainty" of contents).

method and scope of an officer's search for reasonably suspected weapons must be confined to what is minimally necessary to discover the presence or confirm the absence of a weapon, and the specific circumstances will dictate what measures, including but not limited to a preliminary patfrisk, will satisfy that standard. Here, the officers did no more than what was minimally necessary to assure themselves that the defendant did not have access to a suspected weapon in his backpack, and the motion to suppress was properly denied.

*Judgment affirmed.*