Agnes, A.J.
INTRODUCTION
The defendants, John Kerr and his brother Lenny Kerr, are charged by indictment with drug offenses based on evidence seized following a stop of the motor vehicle in which they were riding on Interstate Route 495. They filed pretrial motions to suppress. Based on the credible evidence presented at the hearing on their motions to suppress, I make the following findings of fact and rulings of law.
FINDINGS OF FACT
On the evening of October 15,2002, Massachusetts State Police Trooper Brian McKenna was working the 3:00 p.m. to 11:30 p.m. shift. He was operating a fully marked state police cruiser on Interstate Route 495. Trooper McKenna was completing his three-month “break-in” period and was working with state police trooper O’Malley who was seated in the front passenger seat. Trooper O’Malley is a seasoned trooper with over 15 years experience in a number of different assignments including some involving narcotic drug investigation. At approximately 5:45 p.m., Trooper McKenna observed a small, white hatchback style vehicle heading north on Interstate Route 495. He did not observe the vehicle make any erratic or illegal lane changes. The vehicle did not appear to be traveling in excess of the posted speed limit. There were two occupants in the vehicle (a front seat passenger in addition to the driver), but Trooper McKenna could not see their faces. He did not observe the occupants make any furtive gestures.
Trooper McKenna did observe objects “hanging” from its inside rear view mirror. He was able to see the objects and to determine that one was a pair of sunglasses and the other was an air freshener. Believing that these hanging objects constituted a violation of G.L.c. 90, § 13, Trooper McKenna pursued the white vehicle, activated his cruiser’s emergency lights, positioned his cruiser behind it in the center lane of route 495, and directed the vehicle to pull over. The operator of the white vehicle complied and pulled the vehicle over in the breakdown lane and brought it to a full stop. No other motor vehicles violations were observed.
Trooper McKenna exited his vehicle which was parked about 6-10 feet behind the white vehicle, and approached the driver’s side front window. There were two males seated in the front seat. Trooper McKenna asked the driver for his license and registration. The driver responded by stating he had no license and was unable to produce any identification.[1] The driver also stated that he did not have a registration for the vehicle. At first, he also stated that he did not own the vehicle, but then stated that he had just purchased the vehicle. However, he had no papers concerning such a sale. When asked about his itineraiy, the driver, later identified as defendant Lenny Kerr, stated he was headed to Maine and that he had come from the south. When trooper McKenna mentioned the town of Attleboro, the operator stated that was where they had come from. At this point, trooper McKenna ordered the operator, Lenny Kerr, to step out of the vehicle. He was ordered to step to the rear of the vehicle.
When the conversation resumed, the operator was unable to supply any additional information about his own identity or that of his front seat passenger. He asked trooper McKenna for his denim jacket which was inside the car. Trooper McKenna relayed this request to trooper O’Malley who reached into the vehicle and retrieved it. Trooper O’Malley checked it for weapons by reaching his hand into the jacket’s pockets. Trooper O’Malley removed a glassine bag containing what appeared to be marijuana. He turned toward the operator and asked him “what’s this?” Defendant Lenny Kerr replied that he forgot that was in his jacket. Before any further questioning by the police, defendant Lenny Kerr stated that the glassine bag belonged to him, that there was “no more” inside the vehicle, and “go ahead and look yourself.” The passenger was ordered to step out of the vehicle. Both defendant Lenny Kerr and the passenger who turned out to be his brother defendant John Kerr, were ordered to step to the front of the vehicle.
Trooper O’Malley who had experience in the investigation of illegal drug cases from prior assignments searched the interior of the car. Inside the pocket of another jacket he found a grapefruit-size, cellophane-wrapped ball which he recognized as a common method for storing narcotic drugs. He removed the object, unwrapped it and discovered it contained a white powder substance consistent with cocaine. At this point, both defendants were arrested and advised *491 of their Miranda rights. An inventory search of the vehicle was conducted at the scene.[2]
After the defendants were returned to the police station and booked, they were advised again of their Miranda rights. Trooper McKenna and Trooper O’Malley interviewed each of the defendants separately. The interviews took place in a well lit, comfortable conference room while the three were seated around a large table. Defendant Lenny Kerr was informed that the police had recovered a substantial quantity of cocaine and that he faced serious charges. He told the police that he and his brother left Maine that day at approximately 11:00 a.m. to inspect a carpentiy job at “Ron’s house.’’ He and his brother “ate and drank” at a bar in Attleboro. His brother John left him “for awhile.” When John returned he told Lenny, “Let’s go back to Maine.”
RULINGS OF LAW
1. The police had a sufficient basis to believe that a civil motor vehicle infraction was occurring and therefore a right to stop the vehicle.
G.L.c. 90, §13 provides, in part, that “[n]o person, when operating a motor vehicle, shall permit to be on or in the vehicle or on or about his person anything which may interfere with or impede the proper operation of the vehicle or any equipment by which the vehicle is operated or controlled, except that a person may operate a motor vehicle while using a citizens band radio or mobile telephone as long as one hand remains on the steering wheel at all times ...” This is not a criminal offense for which the police may arrest, see G.L.c. 90, §21, but rather an automobile law violation that has been categorized by the Legislature as a civil motor vehicle infraction, see G.L.c. 90C, §1, punishable by a fine of $35.00. G.L.c. 90, §20. Nonetheless, when the police observe a civil motor vehicle infraction in a location in which they have jurisdiction, they may stop the motor vehicle and issue a citation to the operator. See Commonwealth v. Zorrilla, 38 Mass.App.Ct. 77 (1995).[3] The standards for a motor vehicle stop for a civil motor vehicle infraction and those that apply to stops based on reasonable grounds to believe a crime is being committed are the same. “A police officer is warranted in making a threshold inquiry where suspicious conduct gives the officer reason to suspect that a person has committed, is committing, or is about to commit a crime. That action must be based on specific and articulable facts and the specific reasonable inferences which follow from such facts in light of the officer’s experience. A mere hunch is not enough. Simple good faith on the part of the officer is not enough. The test is an objective one.” Commonwealth v. Bacon, 381 Mass. 642, 644 (1980) (citations and quotations omitted). Accord, Commonwealth v. Mercado, 422 Mass. 367, 369 (1996). See, e.g., Commonwealth v. Sinforoso, 434 Mass. 320 (2001) (speeding and a red light violation); Commonwealth v. Torres, 433 Mass. 669, 673 (2001) (failure to stop at a stop sign); Commonwealth v. Stack, 49 Mass.App.Ct. 227, 233 (2000) (driving with headlights off); Commonwealth v. Robles, 48 Mass.App.Ct. 490, 493 (2000) (same); Commonwealth v. Williams, 46 Mass.App.Ct. 181, 182, rev. den., 429 Mass. 1109 (1999) (unsafe lane change); Commonwealth v. Garcia, 34 Mass.App.Ct. 645, 649, rev. den., 416 Mass. 1102 (1993) (defective license plate).
In order to determine whether the police had a basis for stopping the vehicle, it is first necessary to consider what conduct is prohibited by the statute. G.L.c. 90, §13 describes the infraction as prohibiting a vehicle to be operated when “anything” is on or about the operator or on or in the vehicle “which may interfere with or impede the proper operation of the vehicle.” G.L.c. 90, §13. The “may interfere” language does not mean that a violation occurs whenever in the subjective view of the officer something is present in or on the operator or the vehicle which could impede operation. That view would, in effect, give the police a virtual license to stop any motor vehicle at almost anytime. And, it would make it virtually impossible for a motorist to know what conduct would constitute a violation of the law. See Commonwealth v. Carrion, 415 Mass. 44, 46 (2000) (a penal statute must define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited) (citation omitted). G.L.c. 90, §13 requires the police to apply an objective test: would a reasonable person believe the object or item in question could “interfere with or impede the proper operation of the vehicle or any equipment by which the vehicle is operated or controlled?”
Taking this view of the law, all that is required for a police officer to stop a motor vehicle to issue a citation for a violation of G.L.c. 90, §13 is evidence that there was an object or item in or on the operator or vehicle that a reasonable person would believe could interfere with or impede the proper operation of the vehicle or any equipment by which the vehicle is operated or controlled. See Commonwealth v. Baez, 47 Mass.App.Ct. 115 (1999) (“We think the standard to be used in determining the legality of a stop based on a suspected violation of c. 90, §9D, is whether the officer reasonably suspected, based on his visual observations, that the tinting of the windows exceeded the permissible limits of §9D”). Here, as in Baez, the police acted appropriately by positioning their cruiser so that they could make actual observations of the interior of the defendants’ vehicle before ordering it to stop. Although there was no precise description given of the position or size of the objects seen hanging from the rear view mirror, it is reasonable to conclude that such objects could interfere with the operator’s ability to see objects in the rear view mirror. Contrast Commonwealth v. Whitehead, 49 Mass.App.Ct. 905 (2000) *492 (rescript) (police can’t stop a motorist based on a belief that a traffic violation is imminent).
The defendants place primary reliance on a series of cases from Pennsylvania. See Commonwealth v. Benton, 440 Pa.Super. 441, 655 A.2d 1030 (1994). At the suppression hearing in Benton, the officer testified that he stopped a motor vehicle with an air freshener hanging from the rear view mirror under a Pennsylvania statute that prohibits a person from operating a vehicle with an object hanging from the rear view mirror which materially obstructs, obscures or impairs the operator’s vision. The officer testified he could not determine the exact nature of the object when he first observed it, but did notice it'was several inches long, thin and fiat. He also testified that he stopped the vehicle because “(i)t’s a violation to hang objects.” Benton, 440 Pa.Super. at 448. In Benton, the court held that the officer had acted unlawfully because he erroneously believed that Pennsylvania law prohibited a person from operating with an object hanging from the rear view mirror. Id. at 441.
The result in Benton is consistent with cases that distinguish between an officer’s mistake of fact which does not invalidate action taken which otherwise conforms to constitutional requirements, and an officer’s mistake of law which, despite his good faith, will not validate a search or seizure that otherwise fails to meet constitutional requirements. See, e.g., United States v. Chanthasoxat, 342 F.3d 1271 (11th Cir. 2003) (officer’s good faith but erroneous belief that local or state law required driver to have an inside rear-view mirror, as opposed to any mirror, inside or outside, that provided a view of the rear rendered the stop of the motor vehicle unlawful); United States v. King, 244 F.3d 736, 739, 740-41 (9th Cir. 2001) (officer’s good faith but mistaken belief that operator driving with a disabled person placard hanging from a rear view mirror was in violation of a local ordinance that prohibited obstructions of the windshield rendered the stop of the vehicle unlawful).
2. Whether the police had authority to order the defendants to exit the vehicle.
Based on the fact that neither defendant had a valid license, that a valid registration could not be produced, and that the defendant Lenny Kerr, the operator, gave conflicting answers during the initial threshold inquiry, the police had justification for the continued detention of the defendants and valid concerns for their own safety. See Commonwealth v. Stampley, 437 Mass. 323, 325 (2002). Under the circumstances, the police had reason to be concerned that the vehicle was stolen. Commonwealth v. Pacheo, 51 Mass.App.Ct. 736, 740 (2001). In these circumstances, an exit order was entirely appropriate. Commonwealth v. Gonsalves, 429 Mass. 658, 662-63 (1999).
3. Whether the police had authority to reach into defendant Lenny Kerr’s jacket pockets.
Following the exit order given to defendant Lenny Kerr and while the police were engaged in their threshold inquiry, the defendant asked Trooper McKenna for his jacket. Trooper O’Malley retrieved the defendant’s denim jacket from the vehicle. Before handing it to his partner or to the defendant, Trooper O’Malley reached into the pockets and retrieved a bag of marijuana.[4] The general rule is that a pat frisk is confined to an inspection of the outer surfaces of a person’s clothing and is limited to an inspection for what may be weapons. Recently, the Supreme Judicial Court considered whether the police had an obligation to conduct a pat frisk of containers that are seized during the course of a valid threshold inquiiy. The court reaffirmed the rule that a pat frisk is permitted only to protect against the presence of weapons, and must be confined “to what is minimally necessary to learn whether the suspect is armed and to disarm him once the weapon is discovered.” Commonwealth v. Pagan, 440 Mass. 62, 69 (2003) (citations omitted). In Pagan, the Court also explained that while the limited purpose for which a pat frisk may be undertaken does not depend on whether the frisk is of a person or a container, in the case of a container the police are not always required to conduct a frisk of the outer surface before opening the container to inspect its contents.
It may be that for many, and perhaps most, containers made of soft material, a pat frisk will provide additional information either supporting or eliminating an officer’s reasonable suspicion that a weapon may be hidden within. In such cases, a pat frisk of the container should ordinarily be performed prior to opening the container. With such containers, the pat frisk will either reveal a hard object and justify a further search, or the pat frisk will establish that no hard object is inside, thus dispensing with the need for any further search of the container. However, as here, particular features of the container, readily observable by the police, may make it apparent that nothing short of opening the container will suffice to address the officer's reasonable suspicions. In such cases, we will not require the officers to perform the meaningless ritual of a preliminary pat frisk of the container. Thus, if the container is such that a pat frisk might suffice to establish that there is no potential weapon within, the container may not be opened as part of a search for weapons unless a pat frisk has first been performed. If, however, a pat frisk would not suffice to dispel suspicion and avert the need for a search, no pat frisk need be performed. In each case, the method and scope of an officer’s search for reasonably suspected weapons must be confined to what is minimally necessary to discover the presence or confirm the absence of a weapon, and the specific circumstances will dictate what *493 measures, including but not limited to a preliminary pat frisk, will satisfy that standard.
Commonwealth v. Pagan, 440 Mass. 62, 72-73 (2003) (upholding officer’s decision to open and inspect a backpack that was made of a “pliable material” but filled with hard, heavy objects during a threshold inquiry without first pat frisking the pack’s exterior). There is no evidence before the court to suggest that the police were warranted in dispensing with a pat frisk of the outer surface of the defendant’s denim jacket before reaching into the pockets. There is no basis for an application of the doctrine of implied consent because there is no evidence that the defendant gave permission for his jacket pockets to be searched and no reason why he would expect it. See Commonwealth v. Benoit, 382 Mass. 210, 215 (1981).
4.Despite the unlawful pat frisk, the marijuana should not be suppressed.
I credit the testimony of Trooper O’Malley that based on the fact that neither defendant had a valid license (apart from the fact that no registration could be produced), the inevitable result of this motor vehicle stop was that the defendants, would be arrested and the vehicle would be inventoried and then impounded. The Commonwealth introduced into evidence a written State Police policy (exhibit 1) which provides that whenever a vehicle is impounded, it must be inventoried. It could be argued that an inventoiy of the defendant’s jacket would not have been inevitable because the state police policy gave him a right to request the removal of personal items from a vehicle. Exhibit 1, page 2. It is not necessary to resolve this point, however, because it was inevitable that the contents of the defendant’s jacket would have been discovered during an inventory at the police station during the booking process. See Commonwealth v. O’Connor, 406 Mass. 112, 115 (1989) (Police officer took an intoxicated defendant into protective custody. The officer conducted a pat-down search for weapons while the defendant was standing on the side of the road. While searching the defendant, the officer saw part of a plastic bag protruding from the defendant’s vest. The officer admitted that he could feel that the bag did not contain a weapon. He removed it anyway. Court held that the evidence would inevitably have been discovered during the inventoiy search while booking the defendant at the police station.). This is not a case in which the police acted in bad faith or committed an intentional violation of the defendant’s rights. See Commonwealth v. Padilla, 13 Mass. L. Rptr. 278 (Mass.Super. 2001). Accordingly, while the seizure of the bag of marijuana was unlawful, it will not be suppressed.
5.The seizure of the cocaine from inside the car was lawful.
Despite the fact that the seizure of marijuana was the result of police conduct that exceeded the scope of a valid pat frisk, the search and seizure of the interior of the vehicle was permissible for several reasons. First, before any questioning about any other contraband, defendant Lenny Kerr stated that he had no other contraband in the car and invited the troopers to search it. Under the circumstances, his consent to search the vehicle was freely and voluntarily given and was not the mere acquiescence to a claim of lawful authority. See Commonwealth v. Walker, 370 Mass. 548, 555, cert, den., 429 U.S. 943 (1976). The police did not in any sense exploit the invalid pat frisk to obtain consent to search the vehicle. Contrast, Commonwealth v. Midi, 46 Mass.App.Ct. 591, 595-96, rev. den., 430 Mass. 1102 (1999). Second, for the reasons noted above in section (3), an inventory search of the vehicle was inevitable under the circumstances of this case. And that inventoiy by its terms would have required the police to examine all storage areas and all closed but unlocked containers. See exhibit 1.
6.There is no basis for suppressing any statements made by the defendants following their arrest.
I credit the testimony of the state police troopers that each of the defendants received and waived his Miranda rights at the scene and again during booking and before questioning. There is no evidence in the record that suggests voluntariness is a live issue.
ORDER
For the above reasons, the defendants’ motions to suppress are DENIED.

It turned out that the passenger, defendant John Kerr, also did not have a valid license.

I credit the testimony of the troopers that because neither defendant had a valid license, they would have inventoried the vehicle even if no evidence of dmgs was found and ordered it to be impounded.

The Commonwealth is not required to demonstrate that it is the usual practice of the state police to stop motorists for a violation of G.L.c. 90, §13. The rule in Massachusetts is that regardless of the usual practices of the police, sworn officers may stop motor vehicles based on observations of equipment violations or traffic violations of a minor nature even though the officers harbor a suspicion or even a hunch that far more serious criminal activity is underway and seek to exploit the occasion of a motor vehicle stop to ascertain whether more serious criminal activity is underway. This principle is explained in Commonwealth v. Santana, 420 Mass. 205, 208 (1995) (“The fact that the troopers may have believed that the defendants were engaging in illegal drug activity does not limit their power to make an authorized stop. Police conduct is to be judged under a standard of objective reasonableness without regard to the underlying intent or motivation of the officers involved. It was reasonable for the police to pull over an automobile that violated a motor vehicle law”) (citations and quotations omitted). See also Commonwealth v. Riche, 50 Mass.App.Ct. 830 (2001) (Police officer’s stop of the vehicle was lawful “because he had observed the commission of the offenses of traveling without a rear license plate light”).

Although Trooper McKenna testified that he saw his partner patting the jacket before the discovery of the marijuana, I credit Trooper O’Malley’s testimony that after he retrieved the jacket from the vehicle, he inspected it by reaching into the pockets.