SUPERIOR COURT 
 
 COMMONWEALTH OF MASSACHUSETTS v. JERRELL GREENE-MARTIN

 
 Docket:
 2284CR00723
 
 
 Dates:
 February 6, 2024
 
 
 Present:
 William F. Bloomer Justice of the Superior Court
 
 
 County:
 SUFFOLK
 

 
 Keywords:
 MEMORANDUM OF DECISION AND ORDER ON DEFENDANT'S MOTIONS TO SUPPRESS (Paper Nos. 6, 20)
 
 

             The defendant, Jerrell Greene-Martin ("Greene-Martin"), is charged with trafficking in more than eighteen (18) but less than thirty-six (36) grams of cocaine, and trafficking in ten (10) grams or more of fentanyl. Greene-Martin moves lo suppress the narcotics seized by members of the Boston Police Department ("BPD") during a motor vehicle stop on July 21, 2022, in Charlestown.
            As is expounded upon below, after thorough consideration of the submissions and arguments of counsel and the evidence presented at the hearing, Greene-Martin's motion to
suppress is ALLOWED.
FINDINGS OF FACTS
            The court conducted an evidentiary hearing on January 8, 2024. The court heard testimony from BPD Officers Sergio Medrano, Jr. ("Medrano"), and Jonathan O'Brien ("O'Brien"), and it received in evidence four exhibits. The defendant did not testify and introduced no exhibits.
            The court makes the following findings which arc based on the credible evidence produced at the hearing and reasonable inferences that the Court has drawn from the evidence.
 
                                                            -1-
 
In making these findings, the Court finds the testimony of Medrano and O'Brien was truthful and accurate on the relevant and material points set forth below unless otherwise found by the court.
            Medrano has been a police officer with the BPD since 2015. He has undergone basic training as well as armed gunmen training, which focused on the different ways a person might illegally conceal a firearm on their body. Medrano has been assigned to the Youth Violence Strike Force ("YVSF") for nearly two years. The YVSF is a multi-agency task force that investigates firearm offenses and gang violence throughout Boston on a proactive and reactive basis. Prior to his assignment in the YVSF, Medrano worked as a patrol officer in Roxbury and Dorchester. He has made approximately thirty firearms-related arrests in his police career.
            O'Brien has been a police officer with BPD for ten years. He is currently assigned to the YVSF and has been in that position for approximately two years. Prior to becoming a BPD officer, O'Brien was an officer with the Boston Housing Police, assigned in that capacity to the YVSF for three years. Besides attending 40-hour firearms training, O' Brien himself is a firearms instructor, having served twelve years in the military, including tours in Iraq and Afghanistan, where he was a weapons and tactics instructor in a light infantry unit. He has received advanced training in firearms investigations and drug identification and interdictions. O'Brien has made between 250 and 300 firearm-related arrests and " hundreds" of drug-related arrests in his career as a police officer. Prior to his assignment in the YVSF, O' Brien patrolled in uniform and worked in undercover capacity in various areas of Boston, including Mattapan, Downtown Boston, Chinatown, and Charlestown.
            On July 21, 2022, members of the YVSF, including O' Brien and Medrano, were on patrol in Charlestown due to a recent spike in firearm seizures and violence involving firearms.
 
                                                            -2-
 
Because of manpower constraints, the YVSF concentrates its efforts in areas of the city experiencing the highest rates of violence.
            Between April and July 2022, five incidents involving firearms occurred in Charlestown. See Exhibit ("Ex.") 3 (BPD incident reports). On April I 0, 2022, there was a report of shots fired near the rear of a building on Bunker Hill Street. The next day, an armed robbery involving a firearm occurred on Thirteenth Street. On May 19, 2022, a staff member at Charlestown High School recovered a Glock 9mm handgun without serial numbers from a student. On June 16, 2022, police officers responded to a report of shots fired outside Charlestown High School during graduation ceremonies. Bullets in that instance damaged a car and a building. Finally, on June 26, 2022, officers responded to O' Brien Court for a report of a female who had been bound and gagged in her apartment by men armed with firearms.
            On July 21, 2022, while driving down Medford Street to Charlestown High School in unmarked police vehicle at approximately 7:55PM, Medrano and O'Brien observed a Honda Accord (the " Accord") with heavily tinted side windows traveling in the opposite direction. Upon making this observation, Medrano and O' Brien, along with Officer Muhammed,[1] reversed direction, pulled behind the vehicle, and activated the emergency lights and sirens on their unmarked cruiser. The Accord pulled over. Medrano and O'Brien then observed the occupant seated in the right, rear passenger compartment of the vehicle duck down completely out of sight for a couple of seconds before reappearing.[2] They confirmed their observations with one another. The officers became concerned the passenger in the rear compartment, later identified as Greene-Martin, was attempting to hide or conceal a firearm, weapon, or something else.
 
--------------------------------------------
 
[1] Officer Muhammed did not testify.
[2] The rear window of the Accord was not tinted.
 
                                                            -3-
 
            O'Brien's and Medrano's body cameras captured the interaction between officers and the occupants of the Accord.  O'Brien approached  the driver's side of the vehicle while Medrano and Officer Muhammed approached the passenger side of the car. The body camera shows the side windows of the vehicle to be heavily tinted. O'Brien instructed the driver of the vehicle to roll down the rear passenger windows. Officers observed two occupants in the vehicle - the driver, identified as Deshawn Grayson, and the defendant, who was seated in the right, rear passenger compartment of the car. O'Brien found the seating arrangement "odd." One of the officers asked Grayson if he was an "Uber" driver. Upon receiving a negative response, O'Brien asked Grayson why Greene-Martin was seated in back scat of the car and Grayson mumbled an unintelligible response. O' Brien asked Grayson for his license and registration. Grayson did not have his license in his possession but produced a Massachusetts identification card and the registration to the vehicle.
            While O' Brien engaged Grayson, Medrano spoke to Greene-Martin. Medrano noted the defendant was not wearing his seatbelt. Medrano asked Greene-Martin why he was seated in the back passenger scat of the vehicle. The defendant responded in substance that he had been shot in the leg in May and was more comfortable sitting in the back seat. Greene-Martin appeared nervous and fidgety. He spoke fast and rambled. He looked around the area frequently. Medrano asked Greene-Martin where he was going, and the defendant replied, "back there" (pointing in a backwards direction). Greene-Martin told Medrano he forgot where Grayson was going. Greene-Martin told Medrano that he ducked out of sight from the officers to retrieve his phone because it had fallen to the floor.
            Medrano asked Greene-Martin for identification. Greene-Martin dropped some of his identification cards on the floor of the vehicle. The defendant produced an identification from
 
                                                            -4-
 
one of several compartments in his fanny pack. The fanny pack also contained a knife, which Medrano took and placed on the roof of the car. Greene-Martin handed his identification to O'Brien through the rear window of the car opposite to Medrano.
            O'Brien returned to his vehicle and began records checks of Grayson and Greene-Martin, which included a search of the Criminal Justice Information Services ("CJIS"), the National Crime Information Center ("NCIC"), the Registry of Motor Vehicles, and BPD databases. O'Brien conducted the search of these databases to confirm the identities of the vehicle's occupants, check for any outstanding arrest warrants, and determine whether there were any safety issues associated with the stop. In performing the records checks, O' Brien learned that Grayson had been arrested for a firearms offense in 2018, while Greene-Martin had been arrested for firearm offenses in 2017 and 2019. Both individuals had drug distribution charges as well. O'Brien learned this information within four minutes of approaching the Accord. O' Brien informed Officers Medrano and Muhammed of the past firearm arrests. Concerned for their safety, officers instructed Grayson and Greene-Martin to exit the vehicle. Both men were pat frisked for weapons with negative results.
            O'Brien then "pat frisked" the interior of the car, confining his examination to areas in the vehicle that were within reaching distance of Grayson and Greene-Martin. He started with the interior of the driver's compartment. In the console between the front scats was a scale. A pat frisk of the passenger compartment and glovebox turned up nothing.
            O'Brien next pat frisked the rear passenger compartment in the area where Greene- Martin had been seated. He found the fanny pack Greene-Martin previously had in his possession. As described in more detail below, O'Brien was aware of an emerging trend to hide firearms in fa1my packs. He initially "squished" the fanny pack with his hands in an effort to
 
                                                            -5-
 
determine whether there was a firearm or weapon in the pack. After squishing the fanny pack, O'Brien opened the bag and found money (later determined to be $480 in U.S. currency) in one of the fanny pack's compartments. O'Brien searched through three other pockets in the fanny pack, coming across a credit card, eyedrops, and other items. O' Brien came to the fifth compartment, which he proceeded to squeeze between his fingers. He unzipped and opened the compartment and found a bag containing crack cocaine. Officers then placed the defendant under arrest. A little over seven minutes had elapsed between officers approaching the Accord and the arrest of Greene-Martin.
            Additional factual findings are integrated in the following rulings of law.
RULINGS OF LAW
            The defendant moves to suppress the narcotics and money found in the fanny pack.[3] The court makes the following rulings of law. In so doing, the court recognizes, "[a] passenger in a vehicle may challenge the constitutionality of a stop." Commonwealth v. Buckley, 478 Mass. 861,865 n. 8 (2018) (citing Commonwealth v. Quintas Q., 457 Mass. 107, I IO (2010)).
I.          The Stop of the Honda Accord
            The initial stop of a motor vehicle for having excessively tinted windows was lawful. Sec G.L. c. 90, § 90 (prohibits excessively tinted car windows, as defined therein); Commonwealth v. Baez, 47 Mass. App. Ct. 115, 117-18 (1999) ("[T]he standard to be used in determining the legality of a stop based on a suspected violation of c. 90, § 90, is whether the officer reasonably suspected, based on his visual observations, that the tinting of the windows exceeded the permissible  limits of§  90.").  The court finds the officers had probable cause to believe a motor
 
--------------------------------------------
 
[3] Greene-Martin also moved to suppress his statements, but he did not identify the statements he seeks to suppress, nor did he advance an argument to suppress cer1ain statements at the evidentiary hearing. The argument, therefore, is deemed waived.
 
                                                            -6-
 
vehicle infraction of excessive tint existed. They were patrolling the area because of increased gun violence and several firearm seizures within the last three to four months. A tinted window, given the civil infraction, was a reason to stop the car.[4]
            II.        The Exit Order and Pat Frisks of the Defendant and the Accord
            As a general matter, in the context of a routine traffic stop, "once a stopped driver has produced the necessary papers and they are found to be in order, he and his passengers are to be promptly released." Commonwealth v. Gonsalves, 429 Mass. 658, 668 (1999). Here, however, police observed Greene-Martin not wearing his safety belt and therefore police had a legitimate basis to request identification from the defendant and conduct records inquiries of both the driver and Greene-Martin. Commonwealth v. Cordero, 477 Mass. 237,242 (2017); Commonwealth v. Lobo, 82 Mass. App. Ct. 803,809 (2012).
            The court also finds the exit order and the pat frisks of the occupants of the vehicle as well as the interior of the Accord lawful. "[I]n the absence of reasonable suspicion of a crime or justification to search the vehicle on other grounds, an exit order is justified during a traffic stop if officers have a reasonable suspicion of a threat to safety." Commonwealth v. Torres-Pagan, 484 Mass. 34, 38 (2020). An officer is justified in issuing an exit order to a driver or passenger when "a reasonably prudent [person] in the police [officer's] position would be warranted in the belief that the safety of the police or that of other persons was in danger." Gonsalves, 429 Mass. at 661 (quoting Commonwealth v. Santana, 420 Mass. 205, 212-213 (1995)). A mere hunch is not enough, instead "objective circumstances [must make] it reasonable to issue an exit order to the driver or passengers in a stopped vehicle," Gonsalves, 429 Mass. at 666, because of a
 
--------------------------------------------
 
[4] In addition, the license plate to the vehicle was not affixed to the front of the car and a rear brake light was not functional. These observations, however, seem to have been made after the Accord was stopped.
 
                                                            -7-
 
"heightened awareness of danger." Commonwealth v. Demirtshyan, 87 Mass. App. Ct. 737, 744, (2015). Still, it does not take much for a police officer to establish a reasonable basis to order occupants to step out of a vehicle based on safety concerns, provided that the intrusiveness of the officer's conduct is proportional to the degree of suspicion that prompted it. See Commonwealth v. Daniel, 464 Mas s. 746, 752 (2013); Commonwealth v. Torres, 433 Mass. 669, 672 (2001).
            During a stop for which there is constitutional justification , a pat frisk is permissible only where there is "reasonable suspicion, based on specific and articulable facts, that [the  defendant] was armed and dangerous." Torres-Pagan, 484 Mass. at 38-39. While  the standard  for an exit order is whether the safety  of the officer  is objectively  and  reasonably  threatened,  the standard for the pat frisk of a defendant is reasonable suspicion that a defendant  is armed  and dangerous . Id. at 38; Commonwealth v. Sweeting-Bailey, 98 Mass. App. Ct. 862, 865 (2020). The officer' s fear must be grounded in "specific and articulable facts and reasonable  inferences drawn therefrom." Common wealth v. Edwards, 476 Mass. 341, 345  (2017) (internal quotations omitted).
            Here , the pat frisks of the defendant and Grayson occurred simultaneous with the exit order, and the pat frisk of the interior of the car immediately thereafter was confined to the areas where the occupants of the vehicle could retrieve or grab a weapon. It is well settled that "in appropriate circumstances a Terry type search may extend into the interior of an automobile so long as it is limited in scope to a protective end." Commonwealth v. Silva, 366 Mass. 402, 408, (1974).
            In the present case,  YVSF officers were patrolling  the area due to a rise  in firearm violence and seizures. Five fairly recent incidents involving firearms occurred within a one-mile radius of where Grayson and Greene-Martin were stopped. Upon pulling the Accord over,
 
                                                            -8-
 
Greene-Martin ducked down from the officers' sight for several seconds. These officers make between fifteen and twenty-five car stops per evening. It is not often O'Brien and Medrano see such overt movement upon conducting a routine traffic stop. The officers were concerned the defendant had hidden a firearm, weapon, or something else, and Greene-Martin was fidgety and appeared nervous. Greene-Martin informed the officers he had recently been shot in the leg. O'Brien believed, from his past experience on the YVSF, that victims of firearm violence have a propensity to carry firearms for protection or retribution. A CJIS check revealed Greene-Martin had been arrested in 2017 and 2019 for firearm offenses and Grayson had been arrested in 2018 for the same offense.[5] Finally, Greene-Martin and Grayson were stopped in a vehicle with self- applied, roll-on tint placed on the side windows. While window tinting in and of itself means nothing, O'Brien nevertheless knew from his training and experience that such tint is one layer of concealment often used by individuals involved in drugs and firearms possession.
            Considering all of the above circumstances, the officers had reasonable suspicion to believe the defendant may possess a firearm or other weapon on his person or within his reach in the Accord and presented a danger or threat to them. Torres-Pagan, 484 Mass. at 38-39. Accordingly, the court finds the exit order, the pat frisk of the defendant, and the pat frisk of the interior of the Accord, were lawful in their inception and scope.
III.       The Pat Frisk of the Fanny Pack
            The critical question here, in this court's view, is whether the pat frisk of the fanny pack was lawful and, assuming that to be the case, whether the scope of the pat down and discovery of crack cocaine was permissible under the so-called "plain feel" doctrine.
 
--------------------------------------------
 
[5] The court heard no evidence regarding whether the arrests resulted in convictions.
 
                                                            -9-
 
            The court finds the initial pat frisk of the fanny pack lawful. The fanny pack itself is approximately 10 inches long, 4 to 6 inches wide, and 4 to 5 inches deep. It appears to be made of an expandable nylon-type of material and has several compartments. The court finds the defendant's fanny pack is capable of containing a firearm or other weapon, as in fact it did in the form of a folding knife produced earlier.
            In addition to Greene-Martin's ducking out of site for several seconds in apparent response to the officers' presence, his nervousness, his past firearm charges, the fact that the defendant had recently been shot, and the presence of a knife in his fanny pack, Officers were aware that ten firearms had been recovered from fanny packs in Boston since April 2022. In June 2021, a Boston Regional Intelligence Center ("BRIC") Officer Safety and Awareness Bulletin entitled "Firearm Recoveries from Fanny Pack" had been disseminated to officers. See Ex. 1. The bulletin specifically cautioned officers to be aware of individuals carrying fanny packs around their chest or shoulder to allow easy access to firearms. Since the release of the BRIC report in 2021, members of the YVSF had arrested at least forty individuals who were illegally carrying firearms in fanny packs. In short, carrying guns in fanny packs was an "emerging trend" in Boston at the time of the stop and pat frisks in the present case.
            The court finds a pat frisk of the exterior of the fanny pack for weapons was reasonable in these circumstances. See United States v. Hagood, 78 f .4th 570, 577 (2nd Cir. 2023) (proper to credit officer's knowledge, based on his experience and training, that firearms are increasingly concealed in fanny packs); United States v. Taylor, 60 F.4th 1233, 1242 (9th Cir. 2023) (district court did not err in crediting officers' testimony that fanny packs arc commonly used to store weapons and police observing "uptick" in this type of behavior); United States v. Cardona- 
 
                                                            -10-
 
Vicente, 817 F.3d 823, 828-829 ( I st Cir. 2016) (upholding officer's "touching" of fanny pack after traffic stop in which officer reasonably believed defendant was armed and dangerous).
            The more difficult issue involves the legality of the scope of O'Brien's pat frisk of the fanny pack. In Minnesota v. Dickerson, 508 U.S. 366, 375 (1993), the United Slates Supreme Court held that a police officer may seize contraband found during a pat frisk if the " police officer lawfully pats down a suspect' s outer clothing and feels an object whose contour or mass makes its identity immediately apparent." Thus, a Terry-type frisk is lawful in scope if, during a lawful pat frisk, it is immediately apparent to the police officer, in light of his or her training and experience, that a concealed object is contraband. Id. at 373, 376-377. If manipulation or further physical exploration is required to discern the concealed object's identity, then an unconstitutional search has occurred. Id. at 378-379. The Supreme Court in Dickerson ultimately concluded the search of the defendant's jacket exceeded a lawful Terry-type search when the officer determined that the lump was crack cocaine only after squeezing, sliding, and otherwise manipulating the contents of the defendant's pocket, which the officer already knew contained no weapon.
            In Commonwealth v. Wilson, 441 Mass. 390, 392-399 (2004), the SJC concluded that the plain feel doctrine is consistent with art. 14 of the Massachusetts Declaration of Rights. In Wilson, the SJC explained,
[a]s long as the object's contraband identity is immediately apparent to the officer, there is no further invasion of the suspect's privacy beyond that already authorized by the officer ' s search for weapons. The plain feel doctrine is limited: it does not permit an officer to conduct a general exploratory search for whatever evidence of criminal activity he might find. The contraband nature of the item must be immediately apparent on touch ...
We consider "plain feel" as analogous to "plain view." As long as the initial search is lawful, the seizure of an item whose identity is already known occasions no further invasion of privacy. The only difference between the two
 
                                                            -11-
 
doctrines is the sensory perception used to identify the contraband nature of the object. The plain feel doctrine merely recognizes that if contraband is immediately apparent by sense of touch, rather than sight, the police arc authorized to seize it ...
Once an otherwise lawful search is in progress, the police may inadvertently discover contraband. Requiring an officer who recognizes contraband by plain feel to ignore this fact and walk away from the suspect without seizing the object flies in the face of logic.
Id. at 398-399 (internal citations and quotations omitted).
            The Court in Wilson ultimately found that an officer did not exceed the scope of a pat frisk when he seized a package of "dime bags" of marijuana from the defendant' s waistline in circumstances where the officer immediately recognized the item as contraband without having to manipulate it during the frisk of the defendant for weapons. Id.
            This case, however, docs not involve the discovery of immediately apparent contraband during a Terry-type frisk of the defendant' s person. See Dickerson, 508 U.S. at 378-379; Commonwealth v. Amado, 474 Mass. 147, 153 (2016); Wilson, 441 Mass. at 396-399; Commonwealth v. Osborne, 62 Mass. App. Ct. 445, 450-451 (2004). Nor does it involve a container the size, shape, or material of which would render a pat frisk essentially useless and do nothing either to confirm or to dispel an officer's suspicion  that there  is a  weapon  inside.  See, e.g., Commonwealth v. Pagan, 440 Mass. 62, 68-70 (2003).
            Rather, this case involves the pat frisk of a fanny pack, which is small, pliable, and while by its construction likely necessitates some manipulation of the pack itself to determine whether it contains a firearm of other weapon, it does not require a compartment-by-compartment visual and tactile search to determine whether there is a weapon inside. See Commonwealth v. Brown, 100 Mass. App. Ct. 1130 at *9-10 (2022) (Rule 23.0 opinion) (evidence supported motion judge's conclusion that a gun was discovered through feeling the outside of the fanny pack,
 
                                                            -12-
 
without the need for further manipulation, rather than through the unlawful opening and visual examination of the inside of the fanny pack). 0 'Brien testified that upon conducting the pat frisk of the fanny pack, he felt a hard, rock-like substance that he immediately recognized as being consistent with crack cocaine. However, the body camera video depicts the squeezing or "squishing" of the compartment containing cocaine occurred after the initial pat frisk of the fanny pack.
            In Pagan, the SJC upheld an officer's opening of a heavy backpack containing hard objects for potential weapons during a threshold inquiry without first frisking the exterior of the container. See Pagan, 440 Mass. at 68-73. The Court noted that because containers "come in an infinite variety of sizes, shapes, and materials, ... we ... decline to impose a rule that would automatically require a preliminary patfrisk of any and all containers prior to searching them for weapons during a Terry stop. There are times when a patfrisk of a container will provide no useful information as to its contents, and will therefore do nothing to either confirm or dispel an officer' s suspicion that there is a weapon inside." Id. at 69. The Court offered a cardboard box or a hard-sided suitcase as examples such containers. Id.
            The SJC in Pagan went on to note, however, " [a]t the opposite extreme is a patfrisk of a small container made of soft material, as a patfrisk of such a container would unquestionably suffice to uncover the presence of any weapon or hard object or to confirm that no potential weapon is inside[,]" citing as an example the case of People v. Corpany , a Colorado case, which held that a second search of a fanny pack was not justified as protective search where an officer's initial pat-down of the fanny pack indicated that it did not contain any weapon. Pagan, 440 Mass. at 69-70 (citing People v. Corpany 859 P.2d 865,871 (Colo.1993)). The SJC reiterated that the protective measures taken by police must be "confined to what is minimally necessary to
 
                                                            -13-
 
learn whether the suspect is armed and to disarm him once the weapon is discovered." Pagan, 440 Mass. at 69.
            Here, the court concludes the scope of the search to include a visual and tactile examination of the inside of the fanny pack exceeds the bounds of a lawful pat frisk for weapons. O'Brien lawfully could frisk the exterior of the fanny pack for weapons, but his subsequent compartment-by-compartment search of the container, ending with him squeezing or squishing the last compartment and finding a ball of crack cocaine , exceeded the scope of a permissible pat frisk of the container for weapons. Consequently, the narcotics and cash found in the fanny pack must be suppressed.
ORDER
            For the aforementioned reasons, it is hereby ORDERED that the Defendant' s Motion to Suppress (Papers Nos. 6, 20) is ALLOWED.